James Paul BRASHER, Appellant,

v.

Anthony J. CELEBREZZE, Secretary of Health, Education and Welfare, Appellee.

No. 17802.

United States Court of Appeals Eighth Circuit.

Jan. 21, 1965.

Rehearing Denied Feb. 5, 1965.

James Paul Brasher, pro se.

F. Russell Millin, U. S. Atty., Kansas City, Mo., and John L. Kapnistos, Asst. U. S. Atty., Kansas City, Mo., for appellee.

Before VAN OOSTERHOUT, BLACK-MUN, and MEHAFFY, Circuit Judges.

BLACKMUN, Circuit Judge.

In February 1962, while a patient at the United States Medical Center at

Springfield, Missouri, James Paul Brasher instituted this action under § 205(g) of the Social Security Act, as amended, 42 U.S.C. § 405(g), for judicial review of the Secretary's final decision disallowing his claim for a period of disability as defined by § 216(i) and for disability insurance benefits under § 223, 42 U.S.C. §§ 416(i) and 423. He obtained no relief administratively, even after the district court had remanded the case on the Secretary's motion, as permitted by § 205 (g), for further administrative action. Judge Becker upheld the Secretary's decision and the case is now here on Brasher's appeal.

The claimant was 33 years old when he filed his application in January 1961. In that application he stated that he had been in military service from June 1945 to July 1946; that he had worked for Chrysler Corporation at Evansville, Indiana, from March 1953 to February 1957; that he had never before filed for a period of disability or for social security benefits; that he became unable to work on March 18, 1960, due to tuberculosis; that he had had one year of high school; and that he was not married.

Brasher's application, his pleadings, and his letter-briefs, although informal, enable us readily to ascertain his factual assertions, his claim, and his arguments. His case rests on five factors: treatment "for a period of ten years or longer for a severe liver condition"; permanent deafness in the left ear due to a perforated drum; "a permanent nerve condition"; tuberculosis "that will continue for an indefinite period of time"; and hopeless alcoholism.

This court, in Celebrezze v. Bolas, 316 F.2d 498, 500–01, 507 (8 Cir. 1963), tried painstakingly to set out, with supporting authority of our own and of other courts, the legal standards applicable to appeals of this kind. We noted that (a) the claimant has the burden of establishing his claim; (b) the Act is remedial and is to be construed liberally; (c) the Secretary's findings and the reasonable inferences drawn from them are conclusive if they are supported by substantial evidence; (d) substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion; (e) it must be based on the record as a whole; (f) the determination of the presence of substantial evidence is to be made on a case-to-case basis; (g) where the evidence is conflicting it is for the Appeals Council on behalf of the Secretary to resolve those conflicts; (h) the statutory definition of disability imposes the three-fold requirement (1) that there be a medically determinable physical or mental impairment which can be expected to result in death or to be of long-continued and indefinite duration, (2) that there be an inability to engage in any substantial gainful activity, and (3) that the inability be by reason of the impairment; (i) such substantial gainful activity is that which is both substantial and gainful and within the claimant's capability, realistically judged by his education, training, and experience; (j) the emphasis is on the particular claimant's capabilities and on what is reasonably possible, not on what is conceivable; and (k) it is not the duty or the burden of the Secretary to find a specific employer and job for the claimant but, instead, some effort and some ingenuity within the range of the claimant's capacity remains for him to exercise. These standards were again recognized in our later case of Celebrezze v. Sutton, 338 F.2d 417 (8 Cir. 1964).

The record is fairly substantial. It contains many medical reports and opinions. Brasher himself introduced no medical testimony. He did, however, testify personally before a hearing examiner.

The claimant had had a number of jobs, both before and after his military service. After the war he worked primarily as a spot welder and metal finisher. In March 1960 he was convicted for a Dyer Act violation. A medical examination in a Michigan county jail revealed the presence of active pulmonary tuberculosis. As a consequence, upon be-

ing sentenced, he was sent directly to Springfield. He was given medical examinations on admission there. Progress reports were made from time to time thereafter and, upon his transfer from Springfield in November 1962, a discharge report was issued. Most of these were over the name of Jesse D. Harris, M.D., Clinical Director of the Center and certified by the American Board of Internal Medicine. In October 1962, in connection with his claim for disability, Brasher was examined by Dr. G. D. Callaway, Jr., a private physician of Springfield and board-certified in internal medicine. In November the claimant was transferred to the federal penitentiary at Terre Haute. There, in 1963, through the Division of Vocational Rehabilitation of the State of Indiana, examinations in connection with his claim for benefits were performed. These included a psychiatric examination by Norman M. Silverman, M.D., part-time specialist in psychiatry; a general examination by Byron C. Wheeler, M.D., internist; a psychological examination by Rutherford B. Porter, Director of the Special Education Clinic of Indiana State College; and an ear examination by N. D. Thede, Chief Medical Officer of the Terre Haute penitentiary. Audiograms taken of the claimant were submitted for interpretation to W. J. Mankin, M.D., of Terre Haute, board-certified specialist in otolaryngology and ophthalmology. In July the hearing examiner submitted the numerous medical reports, including the ones we have mentioned and others, to Frank Princi, M.D., of the Kettering Laboratory in Cincinnati. In August certain breathing tests were made by E. R. Denny, M.D., of Terre Haute, board-certified internist. Brasher was finally released on November 15, 1963.

The results of these various examinations are noted as we consider his five factors in turn:

1. The "severe liver condition". The lengthy record, which we have examined meticulously, contains nothing which substantiates the existence of such a condition. Brasher had known that extensive drinking may promote cirrhosis of the liver but none of the examinations disclosed the presence of this condition. Any medicines he took were thus anticipatory rather than remedial. Dr. Harris, in November 1962, in response to Brasher's claim of liver trouble, observed that this was not then significantly present. Dr. Callaway, the month before, noted that the claimant said he had been taking a liver medicine for about ten years in order to "prevent cirrhosis", but the doctor observed, "There is no evidence at this time of liver disease". Dr. Wheeler, in March 1963, stated, "There is no evidence of any significant liver impairment". And Dr. Princi, in his report of August 1963, stated that the studies "indicate no liver dysfunction".

2. Hearing loss. Brasher has complained continuously about his ears and his hearing. In May 1960 Springfield observed a perforation of the left drum and made a diagnosis of chronic otitis media. In the following November "a mixed type of deafness bilateral, with considerable eighth nerve involvement, on the left side" was noted. An audiogram revealed hearing losses on both sides. In January 1963 Springfield reported that it was not in a position to make an estimate as to hearing restoration through surgery and that "in view of his total picture * * * it would be inadvisable to hastily consider any surgery on this subject's ear at this time". Dr. Callaway noted that the patient "was somewhat hard of hearing on occasion during the examination and interview" but "in general it was noted that he was able to respond [to] the ordinary male speaking voice". He also noted the perforation. Dr. Silverman stated, "He does not demonstrate any impairment of hearing inasmuch as he hears the low spoken voice of the examiner adequately at all times". Dr. Wheeler stated that his hearing was "generally good" on the right and "variable" on the left but "He at times can hear a watch or listen to a radio". Dr. Thede stated, "Grossly, the subject can hear the whis-

pered voice at ten feet". He saw no perforation. Dr. Mankin said, "An air conductive hearing aid in the better ear probably would be beneficial". Dr. Princi felt that the ear reports were inconclusive and that malingering was "the most likely interpretation".

3. Nervousness. Dr. Harris noted that, while Brasher was "rather quiet and somewhat withdrawn", there was insufficient basis "to consider the presence of any unusual mental illness"; that while he was attempting to obtain disability recognition, "his conduct became somewhat peculiar"; that he insisted on being locked up in a single cell which he was reluctant to leave; that on a neuropsychiatric examination he received a diagnosis of "Socio-pathic personality, alcoholism, with possibility of incipient psychosis"; and that following his removal to the chronic medical ward "no additional particularly bizarre behaviour came to the attention" of the staff. Dr. Silverman noted that the patient was "tense, restless and anxious all throughout the examination" but was "oriented in all spheres" and "weighs his answers in a cool defensive role". He also stated that "there is no gross evidence of psychosis. The personality is laden with moderate anxiety. * * * Mild harmless paranoid ideas are currently present. * * * He has no psychiatric impairment that would interfere with gainful productivity and rehabilitation". He diagnosed the situation as personality trait disturbance, antisocial personality, and chronic alcoholism. Dr. Wheeler observed, "There are no symptoms of hallucinations, delusions, or illusions". Director Porter observed intelligence within normal range but slightly below average, stimulation "almost entirely from within himself", and "No special tensions, an adequate control of emotions, and an adequate concept of self". He also stated, "it is a pattern of a man well adjusted to custodial care as long as he doesn't have to be productive himself. His history both medical, work, and alcoholism, indicate he is not likely to make effective use of any of his capabilities.

He probably is not employable". Dr. Princi stated, "None of the tests suggest functional disorders severe enough to result in impairment", and that Director Porter's observation of unemployability obviously "is based upon the patient's unwillingness to work and not his inability".

4. Tuberculosis. This obviously is the core item in Brasher's disability claim. The medical report on admission at Springfield showed, on the right, "scattered productive infiltrates from the apex to the first anterior interspace" and, on the left, "scattered productive infiltrates in the left mid-lung field", and "positive sputa by direct smear". The staff diagnosis was "Pulmonary tuberculosis, bilateral, moderately advanced, active". He was placed on treatment in the tuberculosis ward. There is family history of the disease. A progress report in May 1961 stated that Brasher had been on specific anti-tuberculosis therapy, that his sputums had been negative since March 1960 and his chest rays stable since May 1960, and that "He has now reached the point where he could continue treatment as an out-patient and do moderate work". In a report of February 1962 it was stated that his last positive sputum was in March 1960; that his chest rays have been stable since October 1960; that treatment should be continued for at least another year; that he was suitable for consideration for out-patient care; and that "He is able to do light work". A report of November 1962 stated that Brasher appeared to be doing well so far as his tuberculosis was concerned; that when informed of this and that there was no need for him to remain on the tuberculosis ward, "he suddenly began to produce several positive sputums", despite the fact that sputum examinations theretofore had been negative for 18 months; that "our suspicions that these were not his sputum specimens" were confirmed when he refused a bronchial lavage examination; that he was transferred to the chronic medical ward where treatment was continued until he had received over two years of

continuous treatment; that this has now been discontinued "and the patient remains much the same"; that the diagnosis at that time was "Tuberculosis of the lung, moderately advanced, inactive"; and that, as to prognosis, "so far as his tuberculosis is concerned, this is good". It was recommended that he be transferred to an appropriate regular institution. Dr. Callaway in his examination observed that the October 1961 films revealed "some nodularity of a rather vague nature" but no areas of cavitation, and stated, "I believe that he still has active tuberculosis inasmuch as his bilateral disease was very extensive", despite his now negative sputa, and "I expect him to recover and become an arrested case of tuberculosis, but except that his alcoholism will lead to repeated break-downs into active tuberculosis". Dr. Wheeler stated that the claimant "would appear to have moderately advanced pulmonary tuberculosis which is inactive" and his "refusal to admit bronchial lavage prevents a more definitive evaluation". Dr. Princi stated that it was impossible to estimate "what impairment exists, if any. It is entirely probable that there is no impairment at all" and "There is a suggestion here of malingering". Dr. Denny reported that his breathing studies were unsuccessful because of the claimant's failure to cooperate. Upon the examination near discharge the Terre Haute Chief Medical Officer noted that sputum smears and cultures were negative for acid fast bacilli.

5. Alcoholism. Brasher gives a history of some alcoholic episodes and arrests and hospitalization for drunkenness, although he protested before the hearing examiner, "I haven't been but on actually three drunks since 1955". Dr. Silverman stated that "it is predicted that his alcoholism will recur after his release from prison". Dr. Princi stated, "Although there is a history of excessive consumption of alcohol, this seems to be more of a result of his personality defect than the cause of it", and "His alcoholism is entirely unrelated to his organic function".

6. In general. Dr. Wheeler in his report stated, "The prognosis for return to work would appear to be good in regard to his physical abilities. It is possible that he could not perform heavy manual labor. He could return to an occupation similar to his previous industrial jobs. His malfunction appears to be stable. He has no proposed employment objective. The patient could take training for a full time light job". Dr. Princi stated, "His previous work did not require unusual energy expenditure but was dependent upon technical skill. He should be able to continue his previous employment, unless he is indeed a respiratory cripple. There is, at present, no basis for the latter diagnosis", and "it seems that the patient is not motivated to work or to exert any effort".

There is nothing in the record indicating any change since these several reports were issued.

We note in passing certain authorities which have some bearing on Brasher's specific claims: (1) Findings adverse to a disability claimant who has suffered from active tuberculosis have nevertheless been sustained. Pagelow v. Flemming, 189 F.Supp. 671 (D.N.J. 1960); Beaver v. Celebrezze, 211 F. Supp. 753 (D.Ken.1962). Thus, past tuberculosis is not sufficient in itself to support a claim for disability. (2) Adverse findings in the presence of chronic alcoholism even coupled with moderate cirrhosis have also been upheld. Sprouse v. Celebrezze, 214 F.Supp. 906 (W.D.Va. 1963). (3) Section 404.1519(c) of the applicable regulations, 20 CFR § 404.1519, 42 U.S.C.A. pp. 493–494, reads:

"(c) Psychiatric disorders. Among the psychiatric disorders are organic brain syndrome, functional mental disorders, and mental deficiency: * * *

"(2) Functional mental disorders (psychoses, psychoneuroses, personality disorders). The mere presence of psychotic or psychoneurotic symptoms and signs is not necessarily in-

418

compatible with the ability to perform substantial gainful work. * *

"(iii) Personality disorders. Personality disorders are characterized by patterns of socially unacceptable behavior, such as chronic alcoholism, sexual deviation and drug addiction. In the absence of an associated severe psychoneurosis or psychosis, a personality disorder does not in itself result in inability to engage in substantial gainful activity. A person confined in a correctional institution because of antisocial behavior will not be considered disabled unless he has other severe impairments which would preclude any substantial gainful activity if he had not been so confined."

(4) Section 404.1527 of the regulations provides that if a claimant refuses to submit to an examination or test, this shall, in the absence of good cause, "be a basis for determining that such individual is not under a disability". (5) These administrative constructions of the statute are entitled, of course, to great weight and are to be sustained unless unreasonable or plainly inconsistent with the governing statute. Review Committee, Venue VII, etc. v. Willey, 275 F.2d 264, 272 (8 Cir. 1960), cert. denied 363 U.S. 827, 80 S.Ct. 1597, 4 L.Ed.2d 1522; United States v. Ekberg, 291 F.2d 913, 921 (8 Cir. 1961), cert. denied 368 U.S. 920, 82 S.Ct. 242, 7 L.Ed.2d 135. We observe no such unreasonableness or inconsistency here.

■ With the presence in this record (1) of no evidence whatsoever as to the presence of liver disease, (2) of evidence of some hearing ability, although diminished, (3) of no evidence of hearing loss so great as to result in industrial impairment, (4) of no evidence of a personality disorder of greater status than chronic alcoholism, (5) of evidence of past active pulmonary tuberculosis now and for some time in a state of arrest, (6) of credible opinion evidence that the claimant is capable of work similar to that which he performed prior to his federal incarceration, and with only sports and vigorous activity contraindicated, and (7) of instances of non-cooperation in tests and of repeated suspicion, on the part of several examiners, of malingering, we have no alternative than to conclude, as did the district court, that this record, considered in its entirety, most adequately supports the Secretary's findings. In fact, we are impressed with the meticulous and detailed care and consideration which the administrative authorities provided for this claimant and for every medical and legal point he raised.

Affirmed.