**Mae R. MAGRUDER, Plaintiff,**

v.

**Elliot L. RICHARDSON, Secretary of the Department of Health, Education and Welfare, Defendant.**

**No. 70 C 558(3).**

United States District Court,
E. D. Missouri, E. D.

July 27, 1971.

Ellsworth W. Ginsberg, Clayton, Mo., for plaintiff.

Daniel Bartlett, Jr., U. S. Atty., St. Louis, Mo., for defendant.

**ORDER**

WEBSTER, District Judge.

This is an action filed pursuant to 42 U.S.C. § 405(g) of the Social Security

Act, wherein plaintiff seeks judicial review of the decision of the Secretary of Health, Education and Welfare denying her application, filed on August 8, 1968, for disability insurance benefits under 42 U.S.C. §§ 416(i) and 423. Both parties have moved for summary judgment, have waived oral argument and have submitted memoranda in support of their motions.

In her application, plaintiff has alleged that since March 23, 1963 she has been unable to engage in substantial gainful activity due to a heart condition, an enlarged liver and constant back pain. By letter dated Dec. 16, 1968 from the Area Office of Department of Health, Education and Welfare, Social Security Administration, Division of Disability Operations in St. Louis, Missouri her request was denied. Plaintiff protested this ruling. Her application was reconsidered and again denied on July 3, 1969. Plaintiff requested a hearing on Dec. 9, 1969. Such hearing was held March 12, 1970 in St. Louis, Missouri and on April 17, 1970, the Hearing Examiner entered a decision determining that plaintiff was not entitled to disability insurance benefits. The Appeals Council, Bureau of Hearings and Appeals affirmed the Hearing Examiner's decision on Sept. 14, 1970. Thus, plaintiff has exhausted all administrative remedies on her August 8, 1968 application. Plaintiff had filed applications for disability insurance benefits on July 6, 1964 and June 9, 1967. These applications were administratively denied on Jan. 18, 1965 and Nov. 17, 1967 respectively. Plaintiff did not appeal these denials to higher agencies within the Social Security Administration and they are not before this court.

Plaintiff was born in January of 1921 in the State of Missouri. She completed high school and has since lived in the general metropolitan area of St. Louis, Missouri. She presently lives there with her husband. Their two children are grown. She was 42 years of age in March, 1963, the month and year of the onset of the disability alleged. In 1950, she was hired by the Reynolds Company, a metal producer. In the early years of her employment she inspected aluminum foil labels which would pass in front of her on a conveyor and did some packing and wrapping. Later she performed different services, answering the telephone, operating an addressograph machine and also performing certain supervisory tasks on the factory floor. She worked steadily for almost 13 years and her earnings record shows steady increase into March, 1963, the year she terminated active work. Although she has not worked since this time, she still remains on the company rolls.

About a year prior to March, 1963, she complained of developing tendencies towards episodes of extreme fatigue. She also complained of swelling in her legs and ankles. She became dizzy and nauseous, but never actually fainted or became unconscious. In 1962 she began consulting with physicians and has been consulting them steadily ever since. Her attending physician has been Dr. George D. Wohlschlaeger, an osteopathic general practitioner. In April, 1963, he had her hospitalized for tests. She was hospitalized again in February, 1965 when she underwent a hysterectomy. Her most recent period in the hospital was in 1969 at which time she complained that her fatigue was worse than in 1963.

Plaintiff has not attempted any gainful employment since March, 1963. She is on numerous types of heart medication and takes pills to reduce low back pain. She states that this back pain is present constantly and is intensified by physical exertion. If she walks more than a block, she testifies as to becoming extremely short of breath. After making a bed at home, she is exhausted for about an hour. She is capable of cooking a meal, but does not attempt to cook for several persons or entertain. She drives her car infrequently. Her appetite is fair and she sleeps reasonably well. She expects Reynolds to put her on "disability" status and pay her monthly benefits if she is found to be

disabled under the Social Security Act. Financial support is presently from her husband's earnings in full time employment.

The evidence presented to the hearing officer is summarized in the Appendix, which is a part of this Order.

The Eighth Circuit in Celebrezze v. Bolas, 316 F.2d 498 (8th Cir. 1963), Celebrezze v. Sutton, 338 F.2d 417 (8th Cir. 1964) and Brasher v. Celebrezze, 340 F.2d 413 (8th Cir. 1965) has set out the legal standards applicable to appeals under 42 U.S.C. § 405(g). The claimant has the burden of proving his disability before the Secretary, whose findings are conclusive if supported by substantial evidence.

"Substantial evidence" is such relevant evidence that a reasonable mind would accept as adequate to support a conclusion. Celebrezze v. Bolas, Celebrezze v. Sutton, Brasher v. Celebrezze, supra. Where there is conflict in the evidence, it is for the Appeals Council on behalf of the Secretary to resolve that conflict and not for a reviewing court. Celebrezze v. Bolas, Celebrezze v. Sutton, Brasher v. Celebrezze, supra.

The statutory definition of "disability" in §§ 416(i) and 423 imposes a threefold requirement: (1) that there be a medically determinable physical or mental impairment which can be expected to result in death or last for a continuous period of not less than 12 months, (2) that there be an inability to engage in substantial gainful activity and (3) that the inability be the result of the impairment.

Plaintiff last met the earnings requirement of 42 U.S.C. § 416(i) (3) (B) and § 423(c) (1) (B) on December 31, 1968. Therefore, it was incumbent on her to establish that she suffered from the disability of which she complains as of or before that date. The Hearing Examiner, in an opinion affirmed by the Appeals Council, found that plaintiff failed to qualify under the second and third requirements, supra. This court must affirm this finding if it is supported by substantial evidence.

None of the doctors who have examined plaintiff or have studied the records of her case doubt that she is suffering discomfort. There is only disagreement as to what is the cause of her illness and the degree of physical activity she may maintain. Only Dr. Wohlschlaeger presently believes it has been conclusively demonstrated that plaintiff is suffering from mitral stenosis and is unable to engage in some kind of sedentary employment. Dr. Gardner originally agreed with Dr. Wohlschlaeger's diagnosis, but has subsequently had doubts. He has classified her under class II of the American Heart Association's categories, indicating that in his opinion she is capable of sedentary activities.

Doctors Carter, Owen, Schaef and Steinberg all believe that the diagnosis of mitral stenosis is error. They also expressed the opinion that plaintiff is not suffering from total physical impairment and that her heart condition would not prevent her from engaging in substantial gainful activity.

▉ From the contradictory testimony before him, the Hearing Exminer found that plaintiff suffered from only two physical impairments that were medically determinable: (1) an apical systolic murmur possibly producing a degree of mitral insufficiency and (2) mild leg varicosities. He found that plaintiff had failed to prove that these conditions kept her from her previous occupation or some other substantially gainful activity. It is impossible to say that this decision is not supported by substantial evidence.

Dr. Wohlschlaeger testified that plaintiff probably could not be employed in a sedentary position because it would aggravate her low back condition. However, Dr. Eyerman could not diagnose the cause of this asserted pain. To receive insurance benefits under the Social Security Act, it is necessary that an asserted disability be "demonstrable by

medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d). (3). Since the back pain could not be demonstrated on the basis of musculoskeletal or neurological impairments, the Hearing Examiner concluded that any disability arising out of the pain could not qualify for insurance benefits under the Social Security Act. This court finds this determination supported by substantial evidence.

■ Plaintiff asserts that the Hearing Examiner erred as a matter of law in not making specific findings as to gainful occupations in which plaintiff could engage with her impairments.

It has been held that where the Secretary determines that a claimant is able to engage in gainful activity different from original employment, alternative occupations that are actually available, as opposed to merely theoretical, must be suggested. Ber v. Celebrezze, 332 F. 2d 293 (2d Cir. 1964); Robb v. Finch, 311 F.Supp. 122 (W.D.Pa., 1970). The court finds that such suggestions were not required in this case since the Hearing Examiner specifically found that plaintiff had not proved her disability prevented her from working at Reynolds, the place of her original employment. A Hearing Examiner should not be required to suggest alternative activities when he finds that a claimant has not established that disability precluded engagement in the original line of work. Even if such suggestions were to be required in this case, this court would find those actually made by the Hearing Examiner sufficient. He determined that plaintiff could engage in "office work" or be a "cashier in a restaurant."

■ Plaintiff asserts that the Hearing Examiner committed reversible error in referring to the Journal of the American Medical Association in arriving at his decision. See Glendenning v. Ribicoff, 213 F.Supp. 301 (W.D.Mo., 1962); Cook v. Celebrezze, 217 F.Supp. 366 (W.D.Mo.1963). At trial-type hearings administrative agencies are not permitted to take judicial notice of evidence not a matter of common knowledge, since to do so denies parties the opportunity to confront the evidence against them, an element fundamental to a trial. Here, however, the Hearing Examiner merely referred to p. 7 of the Journal of the American Medical Association, edition of March 5, 1960 for the purpose of evaluating Dr. Gardner's statement that plaintiff was American Heart Association class II. Such reference did not have the effect of introducing new material not already contained in the record. It was simply used for the purpose of clarifying and further explicating the testimony of one of plaintiff's own witnesses.

Defendant's Motion for Summary Judgment will be and is sustained.

## APPENDIX

Before the Hearing Examiner plaintiff's husband testified that he or his son must do the heavy housework. He also testified that once every several weeks his wife will suffer acute exacerbations of back pain to the degree that she must be practically carried to the doctor to receive an injection or other treatment for the pain. A friend, Mrs. Esther Graber, who has known plaintiff for 25 years, goes to the plaintiff's home two or three times weekly to perform some of the heavy chores. Plaintiff never travels to Mrs. Graber's home.

The medical evidence before the Hearing Examiner on plaintiff's behalf consisted of physician's reports, hospital summaries and the testimony of two physicians, Dr. Wohlschlaeger and Dr. David A. Gardner, a specialist in internal medicine and cardiology. The following is a summary of the documentary medical evidence introduced before the Hearing Examiner.

There was a report showing plaintiff to have been admitted to the Normandy Osteopathetic Hospital on April 9, 1963, for tests to investigate the cause of reported extreme fatigue. Her cardiac silhouette was said to be normal but an electrocardiogram was said to be border

line, suggesting possible congestive heart disease (deterioration of the blood vessels of the heart and reduced pumping efficiency). Stomach and intestinal films were not remarkable. Other tests were not remarkable. Liver tests done back in 1960 (Exhibit 16) at the Normandy Osteopathic Hospital reportedly had been suggestive of liver enlargement. A brief report by Dr. Gardner dated May 1, 1964 indicates that plaintiff was seen by him on April 20, 1964. He prescribed dioxin.

Dr. Wohlschlaeger's initial report is dated July 30, 1964. He there notes that plaintiff first consulted him on April 20, 1962, complaining of extreme fatigue; also shortness of breach. He found a grade 4 systolic mitral murmur and pre-tibial edema. Cardiac murmurs are graded one through six as to audibility. Grade one is audible only on careful examination, grade six without artificial means of ausculation. The tremors of grade four are frequently palpated as well as heard. Dr. Wohlschlaeger's July 30 diagnosis was as follows: mitral stenosis with right ventricular hypertrophy (swelling of the heart) and early right cardiac insufficiency. He wrote that plaintiff in his opinion should remain on digitalis (a heart drug), potassium, diuretics and a prescribed diet. After April 20, 1962, he saw the patient once every two weeks up through the date of his July 30, 1964 report (Exhibit 19). In that report, he recommends that plaintiff avoid all work except for limited housework.

Dr. Gardner's next written statement is dated September 2, 1964. Plaintiff had returned to him for a checkup on September 1, 1964. His memorandum notes liver enlargement. A diastolic apical murmur which he had heard when plaintiff initially consulted him was unchanged. His report recommends a continuance of diuretics. In a follow-up report dated September 30, 1964, Dr. Gardner again referred to his examination on September 1, 1964 and noted that at that time moderate pre-tibial edema was present along with the dias-

tolic apical murmur and liver enlargement. Pre-tibial edema is a swelling and softening of the tissue between the knee and the ankle. Dr. Gardner's diagnosis at this time agreed with that of Dr. Wohlschlaeger, mitral stenosis with right ventricular hypertrophy—early right cardiac insufficiency—function capacity class 2 in the American Heart Association Classification Range of I–IV as to cardiac instability. He could not detect rales.

Mitral stenosis is a disease affecting the mitral valve in the heart. The valve gradually calcifies, deteriorates and closes, reducing pumping efficiency. Exhaustion, an enlarged liver, diastolic heart murmurs, varicose veins, and pre-tibial edema are all possible symptoms. Rales are abnormal sounds accompanying breathing detected on ausculation.

Plaintiff's complaints contained in a report on consultative examination by a Dr. Owen, a specialist in internal medicine, dated November 30, 1964, were as set forth, supra. On general examination, Dr. Owen found plaintiff to be 5 feet 4 inches tall, weighing 124 pounds. Her pulse was 72 and regular. Her blood pressure was 130/82. She did not appear in distress. The heart sounds were of good quality. The lungs were clear to percussion and ausculation. There was no clinical heart enlargement. There was a grade 1 apical systolic murmur. The doctor could not hear any diastolic murmur. The veins showed moderate varicosities, particularly on the right leg. The extremities did not show any edema. On an exercise test the patient climbed and descended one standard flight of stairs, each step 9″ high. Her pulse was 80 after exercise and regular. She did not seem to have particular dyspnea (heavy breathing). After two minutes of rest she continued to appear comfortable. There was no chest pain. A chest film was at the upper limits of normal. There was no evidence of recent infiltration in any lung field. There was no pleural effusion (fluid in the chest cavity). Accentuated bronchovascular

markings were thought to be due to old healed respiratory infections. An electrocardiogram showed an abnormal form of ventricular repolarization. Some of this was thought to be due to digitalis effect (the result of medication). The physician concluded in his report that since he could not hear any mitral diastolic type of murmur that he was reluctant to enter a finding of mitral stenosis or of rheumatic heart disease. Nor, he wrote, could he find so-called ancillary findings of mitral stenosis such as right ventricular hypertrophy. Nor did chest films, he wrote, show definite signs of so-called mitralization. At best there was a little enlargement of the left ventricle on chest x-ray, and in the presence of an apical systolic murmur, he concluded that there was a possibility of some mitral insufficiency (inefficient valve operation, not caused by disease). He considered the claimant well compensated on her cardiac regimen. The subjective symptoms, however, in his opinion indicated class II in The American Heart Association's Classification system. He advised consideration of rehabilitation for a sedentary type of employment.

Plaintiff was admitted to the Normandy Osteopathic Hospital on February 21, 1965. The purpose of this admission was for a hysterectomy. She had complained of excessive menstrual bleeding. Chest films taken at the time of this admission showed a mild amount of pulmonary fibrosis (scarring of the lung) but no other particular finding. An electrocardiogram supervised by Drs. Wohlschlaeger and Gardner was said to be abnormal. The suggestion of the EKG, according to the report of these physicians, was "some degree of cor pulmonale" (general deterioration of the heart and lungs). Some of the EKG changes were said, however, "to suggest the presence of digitalis effect".

A further written statement (Exhibit 24) by Dr. Gardner is dated April 19, 1967. It states that he last saw plaintiff on March 17, 1967. She had gained weight. It states that an electrocardiogram still suggests some degree of cor pulmonale. It goes on to state, however, that the primary problem, as of April, 1967, was that of "borderline hypometabolism", metabolic processes insufficient to provide the energy she required.

A further written statement by Dr. Wohlschlaeger is undated but was received by the Social Security Administration on July 1, 1967. In it, he states that plaintiff was "ambulatory, but develops exertional dyspnea after attempting housework or shopping." It states further that her pre-tibial edema is grade 1, that is, limited to the ankles. His diagnosis is mitral stenosis with decompensation; also congestive hepatomegaly (swelling of the liver). It states that her prognosis is poor and that she may be a candidate for cardiac surgery in the future.

In a report of an examination conducted by a Dr. Carter, also a specialist in internal medicine, on September 18, 1967, it is stated that plaintiff complained of heart trouble, liver enlargement, shortness of breath and fatigue. She was then on numerous types of medication. On general examination she was 5 feet 6 inches tall, weighing 128 pounds. She did not appear in distress. Heart sounds were indicative of a grade 1 apical systolic murmur. There was right upper abdominal tenseness making it difficult for the physician to evaluate liver size. The legs showed moderate varicosities. The impression on the electrocardiogram was suggestive of left ventricular hypertrophy, myocardial change and/or digitalis effect. A standard exercise test was not done because of an abnormal resting EKG. The chest films were normal, that is the cardiac shadow was normal in size, shape and configuration. Dr. Carter's concluding diagnoses were: (1) varicose veins and (2) possible mitral insufficiency. His report noted that the mitral insufficiency diagnosis was a possibility only because of minimal medical findings referable thereto, not only the slight systolic murmur but also what he

regards as minimal EKG findings. In his opinion there was no medical basis upon which to conclude that a mitral stenosis, as previously diagnosed by plaintiff's osteopath, was present. His report concluded: "I do not find evidence of significant organic disease and no evidence of total physical impairment."

Dr. Wohlschlaeger's next report is dated November 8, 1968. It states that he had seen plaintiff once weekly, over many years, ever since April 20, 1962. In his opinion, over the years since 1962 plaintiff had improved somewhat "to the point where she was able to do most of her housework." None the less, he felt that her overall prognosis remained poor and that she might require cardiac surgery in the future. He noted that as of November, 1968 she had a grade 2–⅜ systolic mitral murmur along with moderate hepatomegaly. He reported that other physicians have of late "confirmed the original diagnosis of decompensating mitral stenosis." His evaluation in November, 1968 revealed, in his opinion, "moderate hepatomegaly 2 fingers below costal margin, "along with grade 1 pretibial edema. He further stated that auscultation of the pulmonary area revealed occasional scattered rales.

Plaintiff was re-examined by Dr. Carter on November 20, 1968. The examination report states that she continued to complain of shortness of breath on attempting to perform light housework; she also stated that at night she would experience some breathlessness but that there would not generally be any need to sit up in bed in order to breathe comfortably. Again she appeared well developed, not in distress. Her weight was 127 pounds, her height 5 feet 6 inches. The pulse rate was 80. The blood pressure was 150/90. Lung sounds were clear. Heart sounds revealed a grade 1 apical systolic murmur. Abdominal examination was negative. Lower extremities showed moderate varicosities. An electrocardiogram was suggestive of left ventricular hypertrophy, myocardial change and/or digitalis

effect. An exercise test was not done. There was absolutely no change from the EKG taken by Dr. Carter one year earlier. Chest films again showed the lung fields to be clear, the cardiac shadow to be normal in size, shape and configuration. Thus the chest x-ray was normal. Dr. Carter entered the same diagnoses as he did one year earlier, namely (1) possible mitral insufficiency and (2) varicose veins. There were absolutely no signs of worsening in any way of any condition found in 1967. He saw the prognosis as fair-to-good. The physician doubted that valvular disease was present. He concluded: "The patient's prognosis would be considerably improved if her medical attention were to be concentrated on reassurance and encouragement of activity rather than exaggeration of the minimal disease present which appears to be the case."

Dr. Mary L. Schaef, a state agency reviewing physician, in a memorandum dated December 9, 1968, concluded that there were no significant findings of organic disease after she reviewed the medical evidence in this case.

A further written memorandum by Dr. Wohlschlaeger (Exhibit 31) is dated January 14, 1969. It reiterates the views which he expressed in November, 1968, again stating that the prognosis is poor and that "due to the acute nature of her illness" she cannot remain ambulatory for any significant time without periods of rest; therefore "it is my opinion she cannot be gainfully employed and this is a permanent condition."

A further medical comment by Dr. Schaef (Exhibit 33) is dated June 27, 1969. She pointed out that one of the plaintiff's own physicians, Dr. Gardner, has noted the functional heart classification to be class II which in and of itself, according to the reviewing physician, would not preclude light work activity.

Plaintiff was examined neurologically by a Dr. Eyerman on March 10, 1969. In his report, he states that he found nothing abnormal about her gait al-

though he did find that her right leg was slightly shorter than her left. Forward bending was normal. There was no definite tenderness or spasm in the low back despite her complaints of low back pain. The straight leg-raising test was negative. There was no diminution of sensation. There was no muscle weakness or atrophy on either leg. Dr. Eyerman wrote that he could not diagnose her musculoskeletal complaints. In view of her report that she suffered from a heart condition, he noted that she would not be a good candidate for any type of musculoskeletal surgery, even if definitely otherwise indicated. He recommended a lumbosacral support and/or injections to provide relief of back pain complained of.

An electrocardiogram supervised by Dr. Gardner was done February 27, 1970. It was suggestive of digitalis effect and was seen as abnormal. It suggested also pulmonary hypertension and/or cor pulmonale, in Dr. Gardner's opinion. Further, it was thought to suggest coronary artery disease with angina syndrome. On the exercise test the patient completed the required forty-two trips in three minutes.

The two physicians who testified before the Hearing Examiner on plaintiff's behalf are both graduates of osteopathic schools in Missouri. Dr. Wohlschlaeger testified that his consultations with plaintiff began back in 1960 and continue at present. Thus, he has seen her on more than one hundred occasions. He first saw her in February, 1960 when she complained of low back pain and he diagnosed a sacroiliac strain. His examination at that time showed varicose veins in both legs, in the lower part. When he saw her in April, 1962 she complained of fatigue and shortness of breath. He then noted a systolic murmur. He also noted slight liver enlargement. He testified that on April 20, 1962 he found a grade IV systolic mitral murmur. He determined the liver enlargement at that time to be grade III. This is a considerable enlargement, he stated, projecting almost

to the iliac crest. He also found grade III edema, considerable swelling of all the tissue between the knee and ankle. Based upon the foregoing, his working diagnosis at that time was myocardial decompensation, he testified. Thereafter, there were numerous visits. During the course of these visits he concluded that a mitral stenosis was present. He further testified that a narrow mitral valve opening cannot be seen and that his diagnosis of mitral stenosis was based on electrocardiograph interpretations provided by Dr. Gardner. Dr. Wohlschlaeger further expressed the opinion that the cardiac condition which he diagnosed is progressive, limiting plaintiff's activities and requiring constant medication. Thus, he would not advise that she engage in any type of gainful work activity. He would recommend heart surgery only as a last resort. Later in his testimony, he stated that the murmur was not grade III but was minimal on her average visit to him. It would be more apt to be pronounced if the plaintiff had some sort of respiratory infection. As to her liver enlargement, he further stated, "it is constant but at a minimal stage when she is in good health." On the average visit to him she has not demonstrated marked edema, "only a little minimal edema." Nonetheless, he feels that any of the foregoing can become pronounced if she should engage in strenuous or even moderate physical exertion. The reason is that physical exertion places demands on the heart for blood circulation and, with the narrowed mitral valve, the heart is not up to meeting the demands. As to whether she maintains adequate reserve capacity to engage in a semi-sedentary or sedentary type of employment, Dr. Wohlschlaeger testified that this would be difficult for him to determine but that in any case she should not, in his opinion, do lifting, carrying, bending, twisting and so forth. He further stated that prolonged sitting, while it would not of course aggravate the cardiac condition, could aggravate the low back symptomatology which she complains of

because "the low back gets compressed sitting." This physician further testified that there is no longer any difference in skill or training of an osteopath as compared to an M.D. and that now the only basis for the schism that remains between M.D.'s and osteopathic doctors is political.

Plaintiff's other expert witness, Dr. David Gardner, has seen her on a number of occasions since 1963. He has not, however, been her attending physician as has Dr. Wohlschlaeger. On examination by him back on May 20, 1963, he testified, he noticed some ṣwelling in her legs and some liver enlargement. He then entered a diagnosis of congestive heart failure. He placed her on digitalis. On examination at that time he detected a low-pitched diastolic murmur heard best at the apex. This, along with his other findings, suggested to him a mitral stenosis. There were several other visits in 1963 and 1964. An electrocardiogram supervised by him in June, 1964 suggested some enlargement of the right side of the heart. Chest films then suggested to him pulmonary fibrosis. This is a condition, he explained, wherein the lung loses its elasticity. Dr. Gardner saw plaintiff on a number of occasions after May, 1963. Usually she would be referred by Dr. Wohlschlaeger. His diagnosis and/or evaluation of her medical condition remained unchanged for the most part thereafter although on February 27, 1970, he supervised an electrocardiogram which included the standard exercise test. Plaintiff on the test completed the forty-two trips within the three-minute period allowed. The EKG showed a change after exercise from the resting state suggesting, in his opinion, coronary artery disease and/or an anginal syndrome. When he saw her again on September 10, 1969, he further testified "I began to question the idea of a mitral stenosis." He decided at that point that plaintiff may simply have been suffering from injury to the mitral valve. This conclusion was based in part on the character of the murmur which had

changed from the way he thought it was some years back. He states that plaintiff's functional classification under American Heart Association categories would be class II, without cardiac symptoms at rest but symptomatic with more than ordinary activity. Thus he would advise that plaintiff restrict herself to a sedentary or semi-sedentary form of employment if, that is, she feels able to engage in any type of work. On further questioning, he stated that plaintiff's performance on the exercise test was indicative of some functional capacity though he would not call it a positive test. He was also reluctant to term it a negative test, concluding that the terms it a suggestive positive test. Overall, he believes plaintiff's main problem is that of congestive heart failure due to a mitral valvular injury. He recommends that plaintiff continue medication designed to slow the heart beat and to strengthen it. He believes that the condition will gradually grow more severe in terms of limiting her in what she can do.

Franz U. Steinberg, M.D. appeared and testified at the hearing in an advisory capacity. He is a specialist in internal medicine and physical medicine and rehabilitation. Though not employed by the Government, he received compensation from the Social Security Administration for time spent in this case providing the Hearing Examiner with impartial medical testimony to enlighten the record. Dr. Steinberg did not personally examine plaintiff, but prior to the hearing he had reviewed all documentary medical evidence introduced. He testified that plaintiff's medical history contained much that was contradictory, both in fact and in opinion. He stated that a diastolic murmur is an important piece of evidence suggesting mitral stenosis, but that he was impressed by the fact that several internists had not been able to detect such a murmur in plaintiff. He noted that a murmur might be present and not be heard where heartbeat is irregular, but there was no mention of irregular heart-

beat in plaintiff's medical history. He concluded if a diastolic murmur was present, it should have been audible at all times. The presence of a systolic murmur only indicates the possibility of mitral insufficiency, he testified, but only a possibility, since the chest x-rays show little or no heart enlargement. Abnormal EKG's can be explained as being the result of continued use of digitalis. The EKG's might also be explained in terms of disease of the heart muscle itself, but Dr. Steinberg emphasized that this too was only a possibility. Even if mitral insufficiency and/or heart muscle damage are present, Dr. Steinberg testified, sedentary or semi-sedentary employment should be within plaintiff's physical capabilities.