Michael A. Telesca, S.
This proceeding was brought by the petitioner, Monroe Community Hospital, pursuant to SCPA 1808, for an order directing the executor to make payment to the petitioner of the sum of $17,691.45 for hospitalization services provided to the decedent, Ernest E. .Schnelle. The executor does not, in this proceeding, controvert that part of the claim for the period commencing upon decedent’s admission to the hospital on August 7, 1972 to February 7, 1973. Accordingly, only the sum of $7,632.28, for the period February 7, 1973 through the decedent’s death on June 25, 1973, is in dispute.
Respondent, Lincoln First Bank of Rochester, is the executor under the last will and testament of the deceased, with letters testamentary having been granted by order of this court .on October 15, 1973. On November 19, 1973, petitioner, Monroe Community Hospital, filed and served its notice of claim, and the executor, by notice of rejection of claim dated December 26, 1973 rejected the claim, contending that the decedent should have been correctly classified a “ hospital ” and “ extended care ” patient as to his condition and actual treatment required for the period February 7, 1973 to the date of his death, June 25, 1973, thus entitling him to medicare coverage.
Ernest E. Schnelle emigrated to the United States from G-ermay prior to World War I and became a naturalized citizen. He never married, and at the time of his death he left only three distributees, all nieces, who live in Germany.
Schnelle lived alone in an apartment in Rochester, New York, where he was found unconscious on August 5, 1972. He was taken to .Strong Memorial Hospital and then transferred to Monroe Community Hospital, where he was admitted as a custodial care patient, having been diagnosed as suffering from arteriosclerosis and general old-age infirmities. The administrators of the hospital then applied to the .Social Security Administration for Medicare benefits on behalf of Schnelle, but the application was rejected since the hospital had classified Schnelle as a custodial patient (see U. S. Code, tit. 42, § 1395g).
Schnelle’s assets were placed in safekeeping by Lincoln First Bank which had been named in Schnelle’s Will as the executor and trustee of his estate. Subsequent to January 1, 1973, a proceeding was commenced to have the bank appointed the conservator of Schnelle’s assets. An affidavit submitted at that time in support of the petition, by Schnelle’s physician at the hospital, stated that Schnelle, who was 85 years of age, was suffering from a chronic brain syndrome reflecting generalized cerebral arteriosclerosis and was confused and irrational. *859 The doctor concluded that Mr. Schnelle was incapable of handling his own affairs and that his cerebral disease was chronic and would not improve. Accordingly, letters of conservatorship were issued by order of the Supreme Court dated March 8,1973.
The Monroe Community Hospital is a facility with approximately 800 beds, and administratively structured in such a way as to provide varying levels of care to persons admitted. Only 60 beds are denominated as lf hospital care ” beds and are located in Ward 2(e). In his total stay at the hospital facility, Schnelle was never physically located in Ward 2(e) for any of the care obtained.. So far as this court is able to determine, he was one floor above, in Ward 3(e).
There Is no dispute in this proceeding regarding the quality of care received by the decedent, which appears to have been excellent. There is also no dispute that the decedent was eligible for insurance benefits under the Social Security Act, and that the Monroe Community Hospital qualified as a hospital within the meaning of the act.
Under the Federal Medicare Statute (specifically U. S- 'Code, tit. 42, § 1395c; § 1395d, subd. [a], par. [1]; § 1395f, subd. ;[a'], par. [2]), a patient would have to receive “ hospital care ” for a three-day qualifying period and thereafter “ post-hospital extended care ’ ’ in order to qualify for the benefits thereunder. It is the executor’s contention that the decedent during the period February 7 to his death on June 25, 1973 received the equivalent of in-hospital care treatment and post-hospital extended care, regardless of the administrative label given to Schnelle, and notwithstanding the fact that he was not physically located in Ward 2(e) or the hospital ward.
The precise issue before this court is whether the hospital procedure in terms of the transfer of patients as between so-called “ hospital beds ” and non-hospital beds decides the question whether the patient qualifies for Federal Medicare benefits. Put differently, if a patient is receiving the equivalent of hospital care regardless of whether located in a hospital wing or a non-hospital extended care wing, does the patient, nonetheless, qualify for Medicare benefits?
The facts developed at a trial of this matter were quite revealing. Dr. Kenneth Piper was assigned by the hospital to be Schnelle’s attending physician commencing in January, 1973. Dr. Piper’s initial evaluation of Schnelle’s condition was that he had five major active problems: (1) chronic confusion; (2) heart disease; (3) a pulmonary condition; (4) an obstruction in the urinary tract; and (5) chronic renal disease. During, the *860 month of January, Schnelle received skilled nursing care, with physicians attending to monitor his situation.
On February 7, 1973, Schnelle developed a fever of unknown origin. Tests were taken and on February 9,1973, Schnelle was diagnosed as having pneumonia. Medication was carefully prescribed for Schnelle so as to not aggravate his kidney condition. Dr. Piper saw Schnelle daily for the next four to five days and Schnelle received increased monitoring and antibiotics for the next 14 days. The care that Schnelle received during that 14-day period ,was the equivalent of in-hospital care. The testimony of Dr. Nolan L. Kaltreider on behalf of the estate, and that of Dr. Anthony J. Izzo, chairman of the Utilization Review Board of1 Monroe Community Hospital, did not dispute the fact that Schnelle during this period of time, was being given a level of care equivalent to that which he would have been given in the hospital ward; both agreed further, that if Schnelle had been their private patient in a nursing home setting, that on February 7 (the date that pneumonia was diagnosed) they would have removed him to a hospital.
After the 14-day period, Schnelle no longer had a fever and his condition became stable. However, Dr. Piper was concerned about his failing kidneys and Schnelle received skilled nursing care from that time until his death. The pneumonia stimulated the increased care that Schnelle needed, and “insulted” his pre-existing conditions. During this period, Schnelle received care that would be unavailable in a nursing home, including examination by specialists, the use of urinary catheter, X rays and a suture for a scalp laceration. Schnelle was receiving the highest level of nursing and physician care at the hospital below the level of intensive care, which provides 24-hour attending physicians and more nurses and supportive machines. Dr. Piper felt that there was “no point” in moving Schnelle to an area in the hospital where he could receive more intensive care (Ward 2E), since he had received the equivalent of hospital care where he was and that level of care was necessary and sufficient. Thus, it was Dr. Piper’s opinion that nothing would have been gained with respect to the level of care Schnelle was to receive if he were to be moved to the hospital ward.
Subsequent to its appointment as conservator, Lincoln-First Bank applied to Social Security Administration for Medicare benefits on behalf of Schnelle, but this application was turned down since Schnelle was still classified -by the hospital as a “ custodial care patient ”. Subsequently, the bank inquired of the hospital, as to whether or not Schnelle could be removed to *861 a nursing home where the daily cost would he approximately $25 less than at the hospital. Dr. Piper rejected this request in a letter dated May 24, 1973, in which he stated as follows: “ he has problems which, taken alone, are not immediately life-threatening, but in some produce a very tenuous state. I feel that at the present time he will have to remain in a rather closely supervised setting here in the hospital * * * For the time being, I feel that he will have to remain in a hospital setting for close management as well as a repetitive nursing observations and nursing assistance in his care ”.
And finally, from June 21, 1973 until his death on June 25, 1973, Schnelle was acutely ill and was receiving in-patient hospital care and yet was still classified as a custodial care patient.
Accordingly, it is my finding that the level of care actually received by Ernest E. Schnelle, during the period February 7 through February 28, 1973, and again from May 24, through June 25, 1973, was the equivalent of in-hospital care as contemplated by the Medicare provisions of the Social Security Act, notwithstanding the fact that he was not physically located in the hospital ward. It is the level and type of care received which controls the entitlement to benefits. The main thrust of the act, simply put, is to insure payments for a particular level of care for the aged. The labels and definitions adopted by Congress are to protect against abuses and were not intended to deny appropriate care and financial assistance for the aged. Thus, the decedent Schnelle, was receiving in-patient hospital services and post-hospital extended services for the period of February 7, .1973 through the date of his death on June 25, 1973, and would have been entitled to Medicare benefits had he been properly classified by the hospital or the attending physician.
The Social Security Act which created health insurance for the aged is remedial and therefore is to be construed liberally to effectuate the legislative purpose, which is to insure that adequate medical care is available to the aged throughout the country. (Walston v. Gardner, 381 F. 2d 580; Brasher v. Celebrezze, 340 F. 2d 413.) In order to give effect to the purposes of the Act and to afford equitable treatment for those seeking its benefits, it is necessary to interpret the provisions of the Act in a sensible, non-technical manner. (Sowell v. Richardson, 319 F. Supp. 689.)
The court, in Sowell v. Richardson, set forth the following standard for evaluating services for the purposes of determining *862 their coverage under the act (p. 692): “It was never intended by Congress that the condition of the insured, treatment that might at any time be necessary, and the pain and discomfort attending inadequate or unprofessional care or lack of care not be considered together ¡with treatment actually provided in determining whether extended care services are justified. Every aspect of the plaintiff’s physical condition must be considered in making the determination. Treatments immediately required are of course a major factor. However, even if no treatment were required the condition of the insured might be so unstable or unsatisfactory as to require the extended services contemplated by the statute.” (See, also, Ridgley v. Secretary of Dept. of Health, Education and Welfare, 345 F. Supp. 983, affd. 475 F. 2d 1222; Reading v. Richardson, 339 F. Supp. 295.)
Regardless of the classification 'given decedent by the hospital and his location within the hospital, the treatment being given decedent and the general condition of decedent mandate the conclusion that he was not merely a custodial care patient, and, accordingly, was entitled to Medicare benefits. This conclusion is supported by the decision in Ridgely v. Secretary of Dept. of Health, Education & Welfare (supra, p. 993) where the court stated: “ Indeed, it appears to this ¡Court that the purpose of the custodial care disqualification in § 1395y (a) (9) was not to disentitle old, chronically ill and basically helpless, bewildered and confused people like Mrs. Hape from the broad remedy which Congress intended to provide for our senior citizens. Rather, the provision was intended to stop cold-blooded and thoughtless relatives from relegating an oldster who could care for him or herself to the care of an EOF merely so that the oldster would have a place to eat, sleep, or watch television. But when a person is sick, especially a helpless old person, and when those who love that person are not skilled enough to take care of' that person, Congress has provided a remedy in the Medicare Act, and that remedy should not be eclipsed by an application of the law and findings of fact which are blinded by bureaucratic economics to the purpose of the Congress.”
What, then, should have been done to assure that decedent received the benefits that he was entitled to under the Social Security Act? The hospital contends that the obligations to secure any possible Medicare benefits rested upon the conservator or decedent’s attorney while decedent was a patient at the hospital. Such a ruling would render nugatory the provisions •of the Social Security Act and the purposes for which it was enacted, Only the hospital is in the position to determine the *863 level of care necessary for its aged patients and only the hospital and the patient’s physician can properly certify that the patient is receiving the care requisite to entitle him to Medicare benefits. Once the hospital classified the decedent as a custodial care patient, the decedent and his representatives were helpless in attempting to secure Medicare benefits. An administrative appeal from the Social Security Administration’s denial of benefits to decedent would have been totally meaningless and futile so long as the decedent was classified as a custodial care patient by the hospital. Decedent was hopelessly entwined in the bureaucratic quagmire created by the classification system utilized by the hospital. This classification system dealt exclusively with the exigencies of the organization of the hospital, which were unique to itself, and have no relationship to the requirements or purposes of the Social Security Act. Placing the burden on the patient or his legal representatives to extricate himself from this bureaucracy so that he may receive those benefits which he is rightfully entitled to, would ;be placing an unduly harsh and unreasonable burden on him which certainly could not have been contemplated by the drafters of the Social Security Act. (Sowell v. Richardson, 319 F. Supp. 689, supra.)
Also, as was stated in Ridgely (supra), Congress has provided a remedy in the Medicare Act for sick, elderly persons, when those that love them are not skilled enough to provide the requisite care. The Social Security Act Medicare benefit is a remedy for which the elderly person has paid throughout his gainfully employed years with the expectation that he will receive the requisite care during his remaining years. One could hardly imagine a person more archetypical than Ernest E. Schnelle, for whom the benefits of Medicare were intended, or a person more vulnerable to the whims of bureaucratic obstructions in the application of the act. He was an 85-year-old emigrant with no relatives in this country, living out his time under the care of the hospital after having worked hard all of his life. Were it not for the hospital’s failure to properly classify the decedent, he would have been entitled to Medicare benefits. This court cannot tolerate the elderly becoming the innocent victims of bureaucratic obstacles at the most vulnerable point in their lives.
For the reasons stated herein this court denies the petition of the petitioner hospital insofar as it seeks recovery on its claim for the period February 7, 1973 through June 25, 1973. in the amount of $7,632.28.