Linda SHELL, Individually and as Next Friend of Lezlie Shell, Her Minor Daughter, Appellant,

v.

MISSOURI PACIFIC RAILROAD COMPANY, Appellee,

v.

Robert M. SHELL, Appellant.

No. 81–2062.

United States Court of Appeals, Eighth Circuit.

Submitted March 10, 1982.

Decided July 2, 1982.

Rehearing and Rehearing En Banc Denied Aug. 4, 1982.

Wilson & Engstrom, Little Rock, Ark., Holloway & Bridewell, Lake Village, Ark., Laser, Sharp, Haley, Young & Huckabay, Little Rock, Ark., for appellants.

Robert V. Light, Little Rock, Ark., for appellee; Herschel H. Friday, Barry E. Coplin, Little Rock, Ark., of counsel.

Before ROSS, Circuit Judge, FLOYD R. GIBSON, Senior Circuit Judge, and McMILLIAN, Circuit Judge.

McMILLIAN, Circuit Judge.

Linda Shell, individually and as next friend of Lezlie Shell, her minor daughter,[1] appeals from a final judgment entered in

---

1. Linda Shell was not involved in the accident. However, she seeks damages resulting from her leaving her job to stay home and care for Lezlie Shell. Throughout this opinion the parties will appear as Lezlie Shell and Robert Shell.

the District Court[2] for the Eastern District of Arkansas upon a jury verdict in favor of the Missouri Pacific Railroad Co. (MoPac) following a collision between a MoPac freight train and a car driven by Robert Shell in which Lezlie Shell was a passenger. For reversal Lezlie Shell argues that (1) there was insufficient evidence to support the verdict; (2) the district court erroneously admitted into evidence testimony as to the Congressional intent with regard to safety duties at grade crossings; and (3) comments made by MoPac's counsel during summation prejudiced a fair trial. Robert Shell, third party defendant, joins in this appeal and argues that the district court erred in failing to grant his motion for a directed verdict on MoPac's third party complaint against him. For the reasons discussed below, we affirm the district court.

The collision occurred at approximately 3:30 p. m. on September 23, 1979, at a grade crossing located in Portland, Arkansas. The crossing runs in an east-west direction across three parallel tracks which run in a north-south direction. On the east side of the crossing there is an intersection of streets; one street runs parallel to the tracks and the other street runs through the crossing. The crossing was equipped with an automatic flasher light warning installation with eight red lights mounted on standards on each side of the tracks as well as stop signs. In addition, there was a warning bell mounted on top of the installation located on the west side of the crossing.

Robert Shell, the driver of the car, and Lezlie Shell, his minor daughter[3] and only passenger, approached the crossing from the north on the street running parallel and east of the tracks. Shell made a right angle turn at the intersection to complete the crossing. It is undisputed that Shell stopped at the stop sign before entering the crossing and then proceeded over two tracks before reaching the third track on which the train was approaching from the north. The train collided with the right rear door of the car. Robert Shell received injuries from which he fully recovered but Lezlie Shell sustained serious and permanent injuries.

Lezlie Shell brought suit by her mother, as next friend, against MoPac alleging that the collision was proximately caused by the combined negligence of the railroad in failing to provide adequate safety devices to warn motorists of oncoming trains, obstructing motorists' views of train traffic by parking a rail tamping machine[4] on a side track near the crossing, and maintaining an abnormally dangerous crossing.

By way of answer MoPac filed a third party complaint alleging that the collision was proximately caused by Robert Shell's wanton and wilful negligence and seeking contribution in the event MoPac was found liable. The complaint was based on statements made by Robert Shell to four individuals who went to the scene to render aid immediately after the collision. The statements were to the effect that Robert Shell had seen the oncoming train but thought that he could "beat it" and that it was "a stupid trick that he had pulled, trying to get across the track." Robert Shell did not deny making the statements but testified that he did not remember making them and that he thought he had been unconscious from the time of the collision until he woke up in the hospital a week later.[5]

At trial it was established that at the time of the collision the flasher lights had

---

2. The Honorable Elsijane T. Roy, United States District Judge for the Eastern and Western Districts of Arkansas.

3. Lezlie Shell was thirteen years old at the time of the accident.

4. A tamping machine is a rail-mounted maintenance machine. The one at issue here was nine feet eight inches high and thirty-four feet nine inches long.

5. Robert Shell's testimony that he was unconscious was not corroborated. All the parties present at the scene testified that Robert was conscious and complaining of aches in his chest. In addition, his wife Linda and the admitting doctor at the hospital both testified that he was conscious, alert and oriented.

been working but that the warning bell had not.[6] It was also established that a tamper had been parked on a side track near the crossing but its location on the track was disputed.[7] It was further established that the train had been travelling within the speed limit and that the train crew had sounded the whistle at least once before entering the crossing.

At trial Lezlie Shell attempted to establish that the crossing was abnormally dangerous and should have been equipped with an automatic short-arm gate. In support of this theory she called Mike Selig, the official of the Arkansas Highway Department responsible for the railroad grade crossing safety activities of the Department. Selig testified that the Department had adopted a formula by which desirable protective devices for crossings were identified. It was developed at trial that application of the formula to this crossing produced a "hazard rating" of 14.8 which called for flashing lights and bell but did not necessarily require a short-arm gate.[8] Selig also testified about his participation as the Department representative on "diagnostic teams" organized as a part of the governmental scheme for administering federal appropriations for construction of warning devices at crossings, and explained the appropriation formula by which federal funds paid for ninety percent of the cost of constructing such warning installations, the local government agency paid the remaining ten percent and the railroad assumed the cost of perpetual maintenance.

Lezlie Shell then introduced two experts, Frank Fowler and John Baerwold, who tes-

tified that, in their opinion, the crossing at issue was abnormally dangerous. The experts based their conclusions on criteria published in various government documents including the Railroad-Highway Crossing Handbook (Handbook) which is published by the Department of Transportation and was referred to by the experts as the "Bible" for the railroad industry in this area. Fowler reviewed criteria from this publication and described the federal Department of Transportation's guidelines for gates at crossings. More than ten pages of the publication were introduced through the testimony of the two experts.

On cross-examination MoPac's attorney read an additional paragraph from the Handbook to Baerwold who testified that, "in a sense, he agreed with it." The paragraph stated in pertinent part: "At the state level there also has been significant changes in the old concept of total railroad responsibility. The present trend is toward public highway agency assumption of greater responsibility for improvement of grade crossings . . . ." Lezlie's counsel objected on the basis that the paragraph was "a statement intended to impress upon the jury that that is the law." The objection was overruled.

Subsequently, MoPac introduced its expert, Thomas Bryant, who testified that, in his opinion, the crossing at issue was not abnormally dangerous. MoPac's counsel read the same Handbook paragraph to Bryant who testified that he agreed with it. Bryant was then permitted to read the following sentence from the Regulations of

---

6. The evidence was undisputed that the warning bell was designed to warn pedestrians. It was also undisputed that Shell's car windows were up, the air conditioner was on and that Lezlie was probably playing the tape deck.

7. The applicable railroad rule required tamping machine to be placed at least 100 feet clear of the crossing.

8. The hazard rating formula assigns points to crossings for highway traffic, railroad traffic, local conditions and accident record and then suggests the recommended protective devices. The formula groups crossings as follows:

| Total Points | Recommended Protective Device |
|---|---|
| 1 through 10 | Signs – Plain or Reflectorized |
| 11 through 25 | Flashing Lights and Bells – Short Arm Gates for Double Track * |
| 25 through 50 | Grade Separation where feasible, otherwise Short Arm Gates |
| 51 through 125 | Grade Separation if possible, otherwise the most feasible treatment |

\* Except where railroad company stated that there would not be more than one train in operation at or occupying the crossing at the same time; and/or that train operating speeds at the crossing were below 70 miles per hour.

Plaintiff's Exhibit 20.

the Federal Highway Administration published in the Federal Register, "[P]rojects for grade crossing improvements are deemed to be of no ascertainable benefit to the railroads and there shall be no required railroad share of the costs." Lezlie's counsel objected on the grounds of relevancy, but the objection was overruled. MoPac later argued in summation, without objection, that the governmental "input" in the decision as to appropriate grade crossing protection should be given some weight by the jury.

At the end of MoPac's evidence, Robert Shell made a motion for a directed verdict on MoPac's claim against him on the basis that there was no evidence of wilful and wanton conduct on his part.[9] The district court denied the motion on the basis that rulings for directed verdicts should be delayed until after the verdict. Therefore the court included among the seven interrogatories submitted to the jury one for a finding on the issue of Robert Shell's alleged wilful and wanton negligence. The court, however, expressed reservations as to whether the proof would support an affirmative finding. The jury did not reach this issue, however, because, in answering the first interrogatory, it found that MoPac was guilty of no negligence which was a proximate cause of the occurrence.

On appeal Lezlie Shell first argues that the evidence was insufficient to support the verdict. In support Lezlie reasons that any negligence on the part of MoPac would entitle her to be compensated for the measure of her damages because it is undisputed that she was not negligent and that, under Arkansas law, the alleged negligence of Robert Shell cannot be imputed to her. Lezlie asserts that the evidence establishes that MoPac was negligent in some degree and therefore she is entitled to recover as a matter of law.

Similarly, Robert Shell argues that the evidence was insufficient to submit the issue of his alleged wilful and wanton negligence to the jury. Shell reasons that even though the jury did not reach this issue, its presence clouded the central issue of whether MoPac was guilty of any degree of negligence to Lezlie.

 We note that Lezlie Shell did not move for a directed verdict on her claim and that neither Robert nor Lezlie moved for judgment notwithstanding the verdict. *See* Fed.R.Civ.P. 50(b). Under such circumstances our review is strictly limited. *See Karjala v. Johns-Manville Products Corp.*, 523 F.2d 155, 157 (8th Cir. 1975), *citing Johnson v. New York, New Hampshire & Hartford R.R.*, 344 U.S. 48, 73 S.Ct. 125, 97 L.Ed. 77 (1952); *Cone v. West Virginia Pulp & Paper Co.*, 330 U.S. 212, 67 S.Ct. 752, 91 L.Ed. 849 (1947); *Tri-State Insurance Co. v. United States*, 340 F.2d 542, 546 (8th Cir. 1965). "We cannot test the sufficiency of the evidence to support the jury's verdict beyond application of the 'plain error' doctrine in order to prevent a manifest miscarriage of justice." *Karjala v. Johns-Manville Products Corp.*, 523 F.2d at 157, *citing United States v. Harrell*, 133 F.2d 504, 506–07 (8th Cir. 1943). We conclude that there was evidence upon which a jury could have returned a verdict in favor of the defendant MoPac.

Lezlie Shell next argues that it was reversible error for MoPac's witnesses to testify to the effect that the government had taken over the responsibility for providing safe crossings. She reasons that the testimony was irrelevant and that it amounted to telling the jury what the applicable law was. Lezlie asserts that her claim is sup-

---

**9.** Arkansas' Guest Statute, Ark.Stat.Ann. § 75–913, provides in relevant part:

> No person transported as a guest in any automotive vehicle upon the public highways ... shall have a cause of action against the owner or operator of such vehicle ... on account of any injury ... occasioned by the operation of such automotive vehicle ... unless such vehicle ... was wilfully and wan-

tonly operated in disregard of the rights of others.

The statute is available as a defense in actions for contribution. *See Troutman v. Modlin*, 353 F.2d 382 (8th Cir. 1965). Therefore, in the present case, both Lezlie and MoPac would have to establish that Robert's negligence was wilful and wanton in order to recover from him.

ported by this court's decision in *Murphy v. L & J Press Corp.*, 558 F.2d 407 (8th Cir. 1977), *modified on other grounds,* 577 F.2d 27 (8th Cir.), *cert. denied,* 434 U.S. 1025, 98 S.Ct. 751, 54 L.Ed.2d 772 (1978) (*L & J Press*). We disagree.

In *L & J Press*, Murphy, a punch press operator, brought a personal injury action against the manufacturer of the press on the basis of strict liability. The parties stipulated to a number of points so that the issues at trial were whether it was feasible for L & J Press Corp. to provide a safety guard on the press and, if not feasible, whether L & J had a duty to warn users of the dangers of the press. Murphy's evidence consisted primarily of the testimony of one expert witness who testified, in part, that the lack of a safety guard in the press was a design defect. Murphy also called the jury's attention to safety guards illustrated in the 1948 and 1960 American National Standards Institute (ANSI) B–11 codes as a means of showing the types of safety guards available at the time the press was manufactured in 1960. Over Murphy's objection, counsel for L & J introduced the 1971 ANSI code as well as an Occupational Safety and Health Act (OSHA) regulation. Both placed the duty to guard on the purchaser or user of the press. During closing argument counsel for L & J stated, "I'm going to lay right here on the table my evidence [the ANSI and OSHA materials] of who has the responsibility of guarding . . . ." In addition, the trial court allowed, over Murphy's objection, a jury request for the ANSI code and OSHA regulation. Shortly after gaining access to these materials, the jury returned a verdict for L & J.

Under these circumstances this court concluded that L & J's introduction of the later ANSI code and OSHA regulation was not proper rebuttal because it expanded the scope of inquiry and altered the course of the trial so that "the central issue of 'feasibility' was lost and the improper issue of 'who had the duty to guard' was tried." 558 F.2d at 412. In so ruling this court stressed:

It is clear that Murphy's use of the 1948 and 1960 ANSI codes was to illustrate the availability of point of operation guards at the time the press was manufactured in 1960. He read no section regarding who had the duty to guard, he did not state that L & J's presses were defective for failure to use those guards illustrated in the manual but directed the jury's attention to the fact that adjustable point of operation guards were available. The use of these standards for this limited purpose is clearly admissible under Rule 402 of the Federal Rules of Evidence . . . .

558 F.2d at 411.

■ In contrast, in the present case Lezlie Shell's experts introduced over ten pages from the Handbook and various other government documents for the sole purpose of establishing that MoPac was negligent in not equipping the crossing with an automatic short-arm gate and that the crossing was abnormally dangerous because it did not comply with government regulations. More importantly, the substance of the contested testimony was first introduced by Lezlie Shell's experts. Selig testified as to the ninety-ten percent appropriation formula by which federal and state funds pay for the costs of constructing crossings and the railroads only assume the cost of maintenance. The contested testimony did not alter the course of the trial but merely explained the philosophy underlying the formula, namely, crossing construction and improvement are of little benefit to the railroads. Finally, the jury in the present case, unlike the jury in *L & J Press*, was properly instructed as to the applicable law covering the railroad's duties. No exception was taken at trial, nor is any asserted here, to the instructions. We conclude that these factors distinguish the present case from *L & J Press*.

The trial judge has broad discretion regarding the admissibility of evidence. *See Raycraft v. Duluth, Missabe & Iron Range R.R.,* 472 F.2d 27, 31 (8th Cir. 1973). The court considered the testimony relating to the contested paragraph from the Hand-

book and the sentence from the Federal Register with care. We have examined both Lezlie Shell's and MoPac's witnesses' testimony and conclude that the admission of the contested material was cumulative and, at most, harmless error. Lezlie's experts introduced extensive testimony from the Railroad-Highway Crossing Handbook and explained how federal funds paid for ninety percent of the cost of constructing new warning devices at crossings and the local governmental agency paid the remaining ten percent of the cost. The contested testimony does not include new matters. No prejudice has been shown. *See Koppinger v. Cullen-Schiltz & Assocs.*, 513 F.2d 901, 907 (8th Cir. 1975).

Lezlie Shell's remaining arguments allege that comments made by MoPac's counsel during summation served to prejudice a fair trial. We note that no objections were made during the course of the argument, nor when the trial court invited further objections following its charge to the jury, nor in a timely motion for a new trial. We conclude that these objections have come too late. *See Connell v. Steel Haulers, Inc.*, 455 F.2d 688, 692 (8th Cir. 1972) (citations omitted). *See also Curtis Publishing Co. v. Butts*, 351 F.2d 702 (5th Cir. 1965), *aff'd*, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967) (a new trial will not be granted where a party seeks to raise the objection that opposing counsel was guilty of misconduct during summation for the first time on a motion for a new trial). Moreover, upon review we do not find that MoPac's counsel's argument contained improper or prejudicial statements sufficient to require a new trial, even assuming the existence of a proper and timely objection. We note that the trial court's instructions to the jury included the following appropriate remonstration:

> Opening statements, remarks during the trial, and closing arguments of the attorneys are not evidence but are made only to help you in understanding the evidence and applicable law. Any argument, statement or remarks of attorneys having no basis in the evidence should be disregarded by you.

Lezlie Shell presents no basis for this court to assume that the jury did not follow this and other instructions of the court.

The judgment of the district court is affirmed.