David Radford MURPHY,
Plaintiff-Appellant,

v.

L & J PRESS CORPORATION,
Defendant-Appellee.

No. 76–1092.

United States Court of Appeals,
Eighth Circuit.

Submitted Feb. 14, 1977.

Decided June 16, 1977.

Rehearing and Rehearing En Banc
Denied Aug. 15, 1977.

putation of four fingers of his right hand while operating a punch press manufactured by L & J; (2) he had suffered $5,000,000 damages for the failure of L & J to provide a guard at the point of operation which would have prevented his injuries; and (3) that L & J failed to post any warning of the danger so that Murphy might know of its imminence.

The case was tried to the jury on the strict liability theory, after which the jury found for L & J, awarding Murphy nothing. The District Court entered judgment accordingly, and Murphy has appealed, briefing some fifteen claims of error and listing fifteen "other errors" for this court's consideration. We have carefully reviewed each of the claims and agree with Murphy that the case must be reversed and remanded for a new trial for reasons we will set forth below.

Ray E. White, Jr., Clayton, Mo., for appellant; Vincent M. Igoe, St. Louis, Mo., on brief.

Stephen D. Hoyne, St. Louis, Mo., for appellee; James J. Amelung, St. Louis, Mo., on brief.

Before CLARK, Associate Justice,* HEANEY and WEBSTER, Circuit Judges.

Mr. Justice CLARK.

This action was filed by appellant David Radford Murphy in the Circuit Court of the City of St. Louis against appellee L & J Press Corporation (L & J) for personal injuries sustained while operating a punch press manufactured by the latter. L & J removed the action to the United States District Court for the Eastern District of Missouri on diversity grounds pursuant to 28 U.S.C. § 1441(a).

Murphy's complaint alleged that: (1) on strict liability principles he had suffered $1,400,000 damages as the result of the am-

## I

Murphy had worked for the Hart Manufacturing Company (Hart)[1] for some two weeks prior to being assigned to the punch press. He was given a cursory explanation of the press operation and had been using it for only two hours when his injury occurred.

The press itself was an open back, inclinable, multifunctional mechanical clutch press of 60-ton rating. It was designed for automatic, semi-automatic or manual operation. L & J neither supplied a guard at the point of operation nor attached any kind of cautionary notice to the press warning of the danger to the operator when used without a point of operation guard.

The function of the press is to supply power in bringing two halves of a die together.[2] The top half of the die is attached to the ram of the press, while the lower half is attached to the base plate. When the clutch is activated, the ram descends with 60 tons of force bringing the two die halves into contact, thereby shaping the metal

---

* Associate Justice Tom C. Clark, United States Supreme Court (Ret.), sitting by designation.

1. Hart is not a party to this action.

2. No dies were furnished with the press.

stock between them. The ram then ascends to its original position and when, as here, it is set for a single stroke, it remains raised until the operator again activates the clutch.

On May 1, 1972, Murphy was manually feeding the press, placing a blank piece of metal stock in the space between the two halves of the die with his hand. He was also manually extracting the formed metal by lifting it from the space between the die halves with his hand. He had not been schooled in the inherent dangers of the press nor warned thereof; neither was he furnished any tongs to place and remove the metal stock when ready, although testimony indicates he was aware his hand could be severed if it was caught under the ram. Some two hours into the shift, Murphy was reaching for the piece of metal on the die when the ram came down and hit his hand, went all the way back up, came half way down again, shook, and went back up. The four fingers of his right hand were severed, leaving only his thumb and two short stubs.

## II

Missouri follows the strict liability provisions of § 402A of the *Restatement of Torts 2d* as adopted in *Keener v. Dayton Electric Manufacturing Co.*, 445 S.W.2d 362 (Mo. 1969), and it was within these parameters that Murphy brought his action.

The parties quickly agreed upon a number of points, including the following: (1) that the safety of the operator was maintained by manually depressing a foot pedal on the press; (2) that the press was highly dangerous without a guard preventing the operator's hands from entering the point of operation (the area between the die halves); (3) that proper guarding would insure complete safety, indeed, that Murphy's injuries would not have occurred had the press been properly guarded; and (4) that the universal custom of the punch press industry has been to rely solely upon the purchaser and user of the machine to supply the guarding either by making his own guards, hiring another company to make the guards, or purchasing pre-fabricated guards from other sources.

With the parties in agreement on these points, the evidence presented at trial focused on two basic issues: was it feasible for L & J to provide a guard at the point of operation; and, if not feasible, did L & J have a duty to warn users of the dangers of the press?

Murphy's evidence consisted primarily of the expert testimony of one expert witness who had examined the press and found three design defects: (1) the lack of a point of operation guard or other protective device to keep one's hands from entering the ram area during the descent of the ram; (2) no provision for protective control of the foot pedal; and (3) failure to provide adequate warning signs or instructional information to the operator. Murphy also called the jury's attention to point of operation guards illustrated in the 1948 and 1960 American National Standards Institute (ANSI) B–11 codes as a means of showing the types of guards available at the time the press was manufactured in 1960.

L & J's case also relied heavily on expert testimony, most of which centered around two propositions. The first was that by placing an adjustable point of operation guard on the machine when manufactured, the functions of the press would be unduly limited in the dies which could be attached, thereby restricting the number of press operations. The second was that the press, as manufactured, was not dangerous and did not become so until a method of feeding as well as dies were added by the purchaser or user. Further testimony indicated that 95% of L & J's presses are sold through dealers, as was this one, and that L & J has no contact whatever with the ultimate press user in those instances.

Over Murphy's objection, counsel for L & J was allowed to introduce the 1971 ANSI code as well as Occupational Safety and Health Act (OSHA) regulation 1910.217 into evidence. The former placed the duty to guard the point of operation on the purchaser or user of the machine, and the latter, which was admittedly modeled after the ANSI code, placed the duty to guard on

the purchaser or user as well. During closing argument, counsel for L & J took the ANSI code and OSHA regulations and made the following statements:

. . . I'm going to lay right here on the table [counsel laid 1971 ANSI B11.1 and OSHA Regulation 1910.217 on the counsel table closest to the jury] my evidence on who—who has the responsibility of guarding at the point of operation, and this is for you to determine what the preponderance of the evidence is. Just because this book says so don't mean you have to find that way. See? So, you use that as evidence. And I will ask you to wait and watch what Mr. Igoe puts on the table as evidence . . .

So, now, we have the '71 standards, OSHA is just getting off the ground. God love our government, we don't want anything different, and we know that in our democratic processes things take a little time, we've got to get our house in order, we've got to set up committees, we've got to set up reinforcing agencies, but one thing has been done, and this you may rest assured, we now have on the statute books from our United States Congress's law that says, "Mr. Dudley, you're right, and what you have been doing throughout your years we're now going to back you up and we're going to put the power of the United States Government and the power of the United States District Court behind you, and we are going to do something about it, and they have done something about it in the form of a statute, part of which reads:

"It shall be the responsibility of the employer to provide and ensure the usage of point-of-operation guards or properly applied and adjusted point-of-operation devices on every operation performed on a mechanical press."

And I submit to you, ladies and gentlemen of the jury, that you heard what I had to say from the statute. We know why the Congress is concerned, and they set it forth in their Act, Public Law 91–596, which I read to you during the case, and it starts off by saying what they are going to do to encourage employers and employees in their efforts to reduce the number of occupational and safety health hazards. They go on further, and I'm not going to read all of the inbetweens, but you have heard the important point, and you also heard that Section 5 talks about the employer furnishing the employee a safe place to work, and, by gum, if he don't do it, he's going to be hauled before this court and he's going to be fined up to $10,000 for each violation.

Following closing arguments, the jury retired to deliberate. Some six and one-half hours later, they asked for copies of the ANSI and OSHA materials, which the trial court allowed over Murphy's objection. A short time later, the jury returned a verdict against Murphy.

### III

The *Restatement of Torts 2d* § 402A provides in pertinent part:

(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

(a) the seller is engaged in the business of selling such a product, and

(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it was sold.

There is no dispute as to L & J's status as a seller,[3] nor is there any claim that the press was not in substantially the same condition as when manufactured at the time Murphy sustained his injuries. Thus it would follow that L & J is liable to Murphy if the press constituted a "defective condition unreasonably dangerous" to Murphy.

It is well settled law in Missouri that failure to provide a safety factor in a ma-

---

**3.** *Restatement of Torts 2d* § 402A, Comment (f) provides: The rule stated in this Section applies to any person engaged in the business of selling products for use or consumption. It therefore applies to any manufacturer of such a product . . .

chine's design (here a point of operation guard or some other protective device) can constitute a "defective condition," *Keener, supra; Higgins v. Paul Hardeman, Inc.,* 457 S.W.2d 943, 947 (Mo.App.1970), and the jury could certainly so find. Moreover, as Murphy had been working on the press for the first time and for less than two hours at the time of his injuries, the jury could also find that under those circumstances, the punch press without proper guarding was unreasonably dangerous. *Higgins, supra* at 947. However, these questions, which lead to the *feasibility* of L & J providing proper guarding, were transformed into a question of "*who had the duty to guard?*" through L & J's introduction of the ANSI and OSHA materials into evidence, statements concerning those materials during closing argument by L & J's counsel and the perusal of the materials by the jury during its deliberations. These actions constitute reversible error and require that the case be remanded to the District Court for a new trial.

L & J claims that the ANSI code and OSHA regulations were offered and admitted for three purposes: (1) to rebut erroneous impressions made on the jury from Murphy's use of 1948 and 1960 ANSI standards; (2) to explain the consensus of opinion supporting the design alternative of leaving the guarding to the purchaser or user; and (3) to demonstrate that L & J was complying with the "government-approved custom of industry" to refute Murphy's allegation that L & J was completely indifferent to or in conscious disregard of the safety of others. In light of the facts as reflected in the record, we find these arguments unpersuasive.

It is clear that Murphy's use of the 1948 and 1960 ANSI codes was to illustrate the availability of point of operation guards at the time the press was manufactured in 1960. He read no section regarding who had the duty to guard, he did not state that L & J's presses were defective for failure to use those guards illustrated in the manual, but directed the jury's attention to the fact that adjustable point of operation guards were available. The use of these standards

for this limited purpose is clearly admissible under Rule 402 of the Federal Rules of Evidence, as it relates directly to the feasibility question, i.e., could L & J have feasibly included some form of protective device on the press.

L & J's argument that the ANSI standards and OSHA regulations reflected a consensus of opinion supporting their "design alternative" of leaving the guarding to the purchaser or user must also fail. First of all, it has only the most tenuous, if any, relevance to the question of feasibility. These materials go to who *should* guard rather than whether L & J *could* guard the point of operation. Second, even if arguably relevant, the impact of these materials on the jury is certainly far more prejudicial than probative and should have been excluded on this ground. Finally, neither the ANSI standards nor the OSHA regulations were in effect at the time the press was manufactured in 1960. Indeed, the ANSI code was not adopted until 1971, while the OSHA regulations were not even in effect at the time Murphy's injuries were sustained.

L & J's final argument, that it was trying to demonstrate compliance with the government-approved industry custom is likewise without merit. This claim relates directly to the "consensus of opinion" issue discussed above and is unpersuasive for the same reasons.

The prejudice against Murphy's case was multiplied during closing argument when counsel for L & J stated:

> I'm going to lay right here on the table *my evidence* [the ANSI and OSHA materials] of who—*who has the responsibility of guarding at the point of operation.* (emphasis supplied.)

Although L & J contends that the following statement, "Just because this book says so don't mean you have to find that way" eliminated any problem the "my evidence" sentence might have created, we are not of that opinion, because shortly thereafter, counsel for L & J went on to argue that Congress passed a law stating employers

shall provide point of operation guards and that the power of the United States Government and the United States District Courts were now behind the ANSI code in the form of The Occupational Safety and Health Act. Murphy's objections to the "my evidence" statement as well as to the "United States Government" statement were both overruled.

L & J contends that the following instruction given during closing argument:

I'll sustain the objection and I will tell Mr. Igoe, and in the event Mr. Amelung might do likewise, I will instruct the jury on the law and the jury will listen to those instructions, and what the lawyers say, in any event, is merely argument.

as well as this closing instruction:

Opening statements and closing arguments of the attorneys are intended to help you in understanding the evidence and applying the law, but they are not evidence.

have corrected any errors. In view of the highly prejudicial and erroneous statements of L & J's counsel, we find these instructions inadequate.

Counsel first led the jury down a blind alley by stating that the ANSI and OSHA materials were "[his] evidence of . . . who has the duty to guard." This injected a false issue of fact into the proceedings, i. e., who *should* guard as opposed to *could* L & J guard. *White v. Gallion,* 532 S.W.2d 769 (Mo.App.1976); *Will v. Gilliam,* 439 S.W.2d 498 (Mo.1969). Moreover, Congress obviously did not pass the OSHA regulation pertaining to employers providing protective guarding on presses, as counsel led the jury to believe, but passed the Act by which OSHA was authorized to promulgate such regulations. The United States District Court has nothing to do with OSHA enforcement proceedings—they come to the United States Court of Appeals for review from the Occupational Safety and Health Review Commission. Finally, we note that the trial court's instructions both during oral argument and in closing did nothing to rectify L & J's argument that the ANSI and OSHA materials were "[L & J's] evi-

dence of . . . who has the duty to guard."

As a final blow to Murphy's case, the trial court allowed, over Murphy's objection, a jury request for the ANSI code and OSHA regulations. The jury had been out for several hours before asking for these materials, but shortly after gaining access to them, returned a verdict for L & J. We find it somewhat more than coincidental that a verdict was reached so quickly after receiving these materials. In light of all that has been discussed above, we are of the view that the jury was unduly influenced by these materials.

## IV

In reversing this case and remanding for a new trial, it might be well for us to point out that we are not, in effect or in spirit, directing a verdict for Murphy. We make no findings pertaining to the punch press as manufactured insofar as whether it is free of defects or defective, whether it is unreasonably dangerous or not.

What we do find is that the introduction of the ANSI code and OSHA regulations so seriously altered the course of the trial that the central issue of "feasibility" was lost and the improper issue of "who had the duty to guard" was tried. All that we expect on remand is that Murphy have the opportunity to fairly and impartially present his case, that L & J be awarded the same opportunity and that the issues remain clear.

Reversed and Remanded.