# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 97-2032

_____

| | |
|---|---|
| Margaret Nichols, | * |
| | * |
| Plaintiff - Appellant, | * |
| | *  Appeal from the United States |
| v. | *  District Court for the |
| | *  Eastern District of Missouri. |
| American National Insurance Co., | * |
| | * |
| Defendant - Appellee. | * |

_____

Submitted: January 15, 1998
Filed: September 8, 1998

_____

Before LOKEN, FLOYD R. GIBSON, and MURPHY, Circuit Judges.

_____

MURPHY, Circuit Judge.

Margaret Nichols sued her former employer, American National Insurance Company (American National), alleging sexual harassment and constructive discharge, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. At trial American National's psychiatric expert was permitted to testify that Nichols exhibited poor "psychiatric credibility" and that her story was unreliable. Evidence was also admitted over Nichols' objection that she had once had an abortion which was against her religious beliefs. Evidence of certain sexual assaults by her supervisor and his attempt to keep her from disclosing them was excluded, as were records relevant to the determination of the date her employment ended. Nichols appeals from the

judgment entered in American National's favor on the jury verdict and claims that the evidentiary rulings deprived her of a fair trial. We reverse and remand for a new trial.

## I.

Nichols worked for American National during two time periods. She was first employed as a home service agent from April 1982 until she resigned in 1988.[1] In July 1991 she was hired again and worked until she left the company in January 1993. In this second period she worked as an agent in two different district offices, first in Kirkwood, Missouri and then in St. Charles. Her duties in the district offices included collecting insurance premiums on existing accounts, developing a network for finding new customers, and selling insurance coverage to individuals. Most of her time was spent traveling to the homes of existing and prospective customers, making telephone calls from her house or from the office, and turning in funds and attending sales meetings at the district office.

## A.

Nichols attempted to prove the following facts at trial, many of which were disputed by American National. She alleged that she was subjected to a hostile work environment by her superiors in both the Kirkwood and St. Charles offices, that the abusive treatment was based on sex and affected a term, condition, or privilege of her employment, that she reported it to several managers, and that she was forced to resign in 1993 because her working conditions were intolerable. She testified at trial that when she went to work in Kirkwood in July 1991, her supervisor, Del Swift, put his arm around her and tried to put his hand on her breast, that she rebuked him in front

---

[1]The district court granted a pretrial motion in limine to exclude all evidence concerning her first period of employment. That ruling has not been challenged on appeal.

of her coworkers, and that he referred to her boyfriend as her "sugar daddy" and hit her on the buttocks while she was bending over. She also said that on two occasions a coworker held up a Playboy magazine in the office and made jokes about it, and that nothing was done about the incidents despite her complaints to Swift and two other managers. She also alleged that Bob Coates, her sales manager in Kirkwood and her district manager in St. Charles, frequently took hold of her knees or touched her breast with his elbow and made suggestive remarks while driving her to customer visits, that he often called or came to her home, and that on one occasion he grabbed her buttocks on a customer's front doorstep.

Nichols presented evidence that when she started at the Kirkwood office she was assigned to take over a book of insurance accounts that had lapsed and had missing funds. The accounts were in disarray, and her commissions and bonuses were lower as a result. She alleged that she complained about the problems to Swift, but he blamed her for any deficiencies, threw sales materials on the floor at meetings rather than handing them to her, and ultimately took away her sales materials and ordered her not to issue any new policies. Nichols testified that she reported Swift's conduct to the regional director, David Evavold, but that he took no action, and that she was humiliated when Swift and Coates accompanied her to collect premiums and would not allow her to handle money in front of customers for a period of twelve weeks. She testified that Evavold held a staff meeting regarding her account book at which he called her a thief but that he admitted when others were out of earshot that she was not.

There was evidence that Swift tried to fire Nichols in early July 1992 on the basis that premium money was missing from her book, but the home office rescinded the termination after she filed union grievances and appealed to central administration. Higher management sent Charles Baker to investigate the situation. He met with Nichols and other Kirkwood staff and asked her to write down all her problems with the book of insurance accounts. Nichols testified that Baker refused to entertain her complaints about sexual fondling and degrading remarks by her supervisors, however.

He said he was only there to investigate matters relating to her account book, but that he would make a note that she had such other complaints. After Baker's investigation, management promised to remove from her record any reference to lapsed insurance policies and to provide back pay to compensate for lost commissions and bonuses. Nichols contends that the company never lived up to this agreement and that no investigation was ever made concerning her complaints about sexual harassment.

At this time Nichols was transferred to the St. Charles office where she remained until she left the company in January 1993. She claimed that because her policy lapse rates were not reduced in accordance with the agreement, her earnings continued to go down, and that Coates, who had become district manager in St. Charles, told her he wanted to replace her but continued to grab and fondle her knees, buttocks, and breasts. She said she repeatedly told Coates to stop touching her and that his advances were unwelcome, but she did not file a written complaint. American National had a sexual harassment policy which provided that a complaint against a superior in one's direct line of command could be filed with a central management officer. Nichols testified that she was afraid she would be fired if she tried to file such a complaint and that she had always been told at agency meetings that any written correspondence with the home office had to be approved by a manager.

Nichols alleged that she was forced to resign on January 25, 1993, after Coates told her he intended to replace her with a white male, attempted to rape her on January 22, and then three days later fondled her breasts and asked her to sign an undated resignation form in exchange for her pay check. She claimed that January 25, the date when Coates delivered her check and the resignation form, was the date of her resignation and constructive discharge. American National argued she had already resigned before January 22 and that she had not reported the attempted rape and January breast fondling to the EEOC so that evidence was excluded at trial.

B.

Nichols filed a charge of discrimination with the Equal Employment Opportunity Commission (EEOC) on November 15, 1993, alleging that American National had discriminated against her on the basis of her sex and that as a result she was forced to resign on January 25, 1993. After receiving a right to sue letter, she brought this action, raising sexual harassment and constructive discharge claims and seeking compensatory and punitive damages.[2] She claimed that she would have earned more at American National if her working conditions had not been so abusive and that her lost wages should include the difference between her earnings after she was forced to leave the company and the amount she would have properly earned there. She also sought compensation for mental anguish, pain and suffering, and emotional distress during her employment with American National and afterwards.

American National moved to strike or dismiss the complaint on the ground that Nichols' EEOC charge was not timely. It claimed she gave oral notice of her resignation on or before January 15, 1993, which it considered the date of the adverse employment action on which she based her claims. It supported this contention with a nonproductivity report on Nichols completed by Bob Coates dated January 15 which indicated that she would be leaving the company on January 22, 1993. Under American National's interpretation, Nichols had 300 days from January 15, or until November 11, in which to file her EEOC charge, and her charge filed on November 15

---

[2]Nichols' complaint also raised claims for sex discrimination, breach of contract, breach of a covenant of good faith and fair dealing, tortious interference with business expectancy, and intentional infliction of emotional distress. Summary judgment was granted in favor of American National on all of these claims except for sex discrimination, and the dismissals have not been appealed. The sex discrimination claim survived a motion for summary judgment, but Nichols chose not to submit it to the jury.

was therefore untimely. <u>See</u> 42 U.S.C. § 2000e-5(e)(1); <u>Ashley v. Boyle's Famous Corned Beef Co.</u>, 66 F.3d 164, 167 (8th Cir. 1995) (en banc). Nichols claimed that January 25, the day she was forced to resign, triggered the 300 day period so that her EEOC charge was timely filed, but that even if the period started earlier, her complaint should not be dismissed because there were continuing violations of Title VII.

The district court treated the motion to strike or dismiss as one for summary judgment and denied the motion because a pattern of sexual harassment was alleged which continued beyond January 19, 1993. The court reasoned that acts on or after January 19 were undoubtedly covered by her November 15 charge and that it was also possible Nichols could recover for prior acts on her continuing violation theory except that she had not at this point rebutted the company's assertion that she had communicated her intent to resign by January 15. Nichols filed a motion for reconsideration and submitted an affidavit and a copy of notes taken by the EEOC investigator. The investigator's notes contained a statement from Coates that he had told Nichols on January 25 it would be best for both of them if she found a different position and that she had resigned on that date. On reconsideration the court determined that Nichols had shown a genuine issue of material fact as to the date of her resignation and that she could pursue relief for the entire pattern of conduct during her second period of employment if she could prove that she was constructively discharged on or after January 19, 1993.

At trial there was conflicting evidence concerning the date Nichols resigned. The EEOC charge stated that Nichols was forced to resign on January 25, 1993. Nichols offered evidence that Coates told the EEOC investigator she resigned on Monday, January 25 at his urging and that she collected premiums with Coates on January 21. Nichols testified that she accepted a job at Liturgical Publications on January 22 and that her first assignment there began on January 26, but that she had previously observed another employee's work for a few hours in order to decide whether to take the job. The EEOC intake questionnaire asked for the most recent date

-6-

of alleged harm and Nichols had answered "end of March - 93 1/25/93." During the intake interview, however, the clerk made notes indicating "that she was forced to resign Jan. 17, 1993, which cont. through March." At trial the clerk did not remember the interview and could not explain the meaning of "continued through March," but it was her practice to explain the 300 day rule. American National offered evidence that Coates thought Nichols would be leaving the company on Friday, January 22 and that he had a resignation form signed by her with the date of January 22 entered in his handwriting. The company pointed out that she was on vacation status for the two weeks ending on January 22, and there was evidence that Nichols was hired by Liturgical Publications on Monday, January 18 and that she participated in training that week. The jury never reached the issue of when Nichols resigned because of the way the verdict form was designed.

C.

During trial American National moved twice for judgment as a matter of law on Nichols' Title VII claims and her requests for damages. Both motions were denied, and the case was submitted to the jury. There were separate verdict forms for the sexual harassment and constructive discharge claims. The first question on each form asked the jury to find for one party or the other on whether there had been sexual harassment or constructive discharge. If the first question were answered in Nichols' favor, the jury would then need to answer in question two whether she had communicated her intent to resign by January 18, 1993 or sometime after that date. Damage questions followed. Since the jury answered the first question on both forms in American National's favor, it did not reach the questions about the date Nichols left the company or her damages. Nichols moved for a new trial after judgment was entered on the verdict, but the motion was denied.

II.

Nichols argues that evidentiary rulings by the trial court denied her a fair trial and prevented the jury from fully considering her claims. She contends that opinions given by American National's psychiatric expert on her credibility were not a proper subject for expert testimony under Fed. R. Evid. 702 and that she was prejudiced by the admission of testimony that she had had an abortion in violation of her religious beliefs. She also says that the court abused its discretion by excluding evidence that Coates had sexually assaulted her and then intimidated her into not disclosing his conduct to the EEOC and by excluding evidence showing that she continued to work for American National after January 19, 1993. American National maintains that the testimony of its expert met the requirements of Fed. R. Evid. 702 and that the probative value of the abortion evidence was not substantially outweighed by the risk of unfair prejudice. See Fed. R. Evid. 403. American National contends that the excluded evidence was either outside the scope of the EEOC charge or the requirements of the pretrial order.

A.

Nichols sought damages for emotional distress and in support offered the testimony of Dr. Judith Tyndall,[3] a licensed psychologist. Dr. Tyndall based her opinion on a number of psychological tests she administered and interviews with Nichols.[4] She concluded that Nichols developed Post Traumatic Stress Disorder (PTSD) as a result of feeling stalked and embarrassed in front of her colleagues by

---

[3]Each side spells the psychologist's name differently. Since Dr. Tyndall was Nichols' witness, we use her spelling.

[4]The dissent asserts that Dr. Tyndall's opinions were completely based on what Nichols told her. Dr. Tyndall administered at least six different psychological tests, however, and she testified about test results in the course of explaining the foundation for her opinion.

Coates, Swift, and Evavold.  Dr. Tyndall also believed that Nichols suffered from dysthymic disorder, or low-grade depression, and generalized anxiety disorder aggravated by her experiences at American National.  In Dr. Tyndall's opinion the sexual assault by Coates on January 22, 1993 was a major traumatic event that could have precipitated Nichols' PTSD.  Although she testified about this traumatic cause at her deposition, she was not permitted to mention this basis for her diagnosis at trial.

American National offered the testimony of Dr. Elizabeth Pribor, a psychiatrist who conducted an independent evaluation and interview of Nichols.  Dr. Pribor also had access to Dr. Tyndall's notes and report, raw data, and computer generated test scores, and Nichols' medical records.  Dr. Pribor agreed that Nichols suffered from low-grade depression and generalized anxiety disorder, but she considered them long term problems developed before Nichols started at American National.  She disagreed with Dr. Tyndall's diagnosis of PTSD and additionally concluded that Nichols had a personality disorder and undifferentiated somatoform disorder.[5]  She did not rule out the possibility that Nichols' depression was aggravated while she worked at American National from 1991 to 1993, but she said that the aggravation would have been before January 19, 1993, the date which the company says started the 300 day period in which Nichols would have to show violations.

One of the central issues on this appeal is whether Dr. Pribor was permitted to testify beyond the proper scope of expert opinion.  Nichols complains that Dr. Pribor went beyond diagnostic opinion to testify about her veracity and credibility.  Dr. Pribor testified that Nichols had poor psychiatric credibility.  She defined this as poor ability to assess the cause of her own psychological state or to report her psychological symptoms accurately.  In reaching this assessment she relied on her conclusions that

---

[5]Dr. Tyndall defined undifferentiated somatoform disorder as a pattern of seeking medical care for physical symptoms without medical cause and which most likely reflect a psychiatric problem such as severe stress or anxiety.

Nichols had multiple psychiatric stressors in her life but that she focused only on her experience at American National, that Nichols said she had no psychological problems before working for American National, that Nichols did not want to be in Dr. Pribor's office and refused to answer some of her questions, that Nichols had had difficulties at several jobs in the past, and that her claims of harassment changed over time. Dr. Pribor testified that Nichols had difficulty interpreting social settings and a tendency to blur fantasy with reality. She also stated that in an independent evaluation "you need to interpret and weigh what they tell you" or else "you can get a very skewed and inaccurate view of what actually happened."

Dr. Pribor also gave her opinion that Dr. Tyndall had been influenced by the way Nichols related what had happened to her. She said that Nichols had recall bias and that her statements were affected by secondary gain and malingering She testified that "recall bias" refers to an individual's belief that she has not experienced certain symptoms even though her medical records indicate otherwise, such as Nichols' statement that she had not experienced symptoms of depression and anxiety before she worked at American National. She defined "secondary gain" as the possibility that claimed psychological symptoms are motivated by financial gain and mentioned the potential for secondary gain in litigation where money is sought. She criticized Dr. Tyndall for using a structured interview in diagnosing PTSD because it could allow Nichols to act under the influence of secondary gain and recall bias, "and this is -- I mean this is what happened." She also defined "malingering" as feigning or making up symptoms for the purpose of secondary gain.

Nichols brought a motion in limine related to this evidence and objected several times during Dr. Pribor's testimony. Nichols objected immediately when Dr. Pribor began to discuss psychiatric credibility, on the grounds that this was not a proper subject for expert testimony, that the term did not refer to a medical diagnosis, that there had been no foundation establishing that Dr. Pribor's opinion was the kind an expert should give, and that much of her testimony invaded the jury's province to

determine credibility. Nichols' attorney raised several more objections as Dr. Pribor continued, pointing out that this testimony invaded the province of the jury. American National repeatedly responded that the testimony was all related to the cause of Nichols' emotional distress and that it was offered only on the issue of damages, not on liability. No limiting instruction to this effect was ever given to the jury, however, and the objections to the evidence were all overruled.

Expert testimony is permissible when "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. Before admitting proffered expert testimony the trial court must ensure that it is scientifically valid -- that it is both reliable and relevant. Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 589, 594-95 (1993). The reliability inquiry is a flexible one, but factors to consider include: (1) whether the reasoning or methodology underlying the testimony can be and has been tested, (2) whether it has been subjected to peer review and publication, (3) what the known or potential rate of error is, and (4) the degree of acceptance within the relevant scientific community. See id. at 593-94; see also Gier v. Educational Service Unit No. 16, 66 F.3d 940, 943-44 (8th Cir. 1995) (upholding exclusion of expert psychiatric testimony under Daubert). The relevancy of the testimony depends upon whether it can properly be applied to assist the trier of fact to decide facts in issue. See Daubert, 509 U.S. at 592-93. Such evidence is not helpful if it draws inferences or reaches conclusions within the jury's competence or within an exclusive function of the jury. See United States v. Call, 129 F.3d 1402, 1406 (10th Cir. 1997), cert. denied, 66 U.S.L.W. 3772 (U.S. June 1, 1998) (No. 97-8142); Pelster v. Ray, 987 F.2d 514, 526 (8th Cir. 1993).

The challenged testimony impugning Nichols' psychiatric credibility and suggesting that recall bias, secondary gain, and malingering had influenced her story

was not a proper subject of expert testimony under Fed. R. Evid. 702.[6] The record does not show that these theories met the Daubert criteria, and in her testimony Dr. Pribor sought to answer the very question at the heart of the jury's task -- could Nichols be believed? She testified that she needed "to interpret and weigh" what Nichols said or she could "get a very skewed and inaccurate view of what actually happened" and that Nichols was a malingerer motivated by financial gain. Opinions of this type create a serious danger of confusing or misleading the jury, see Fed. R. Evid. 403, causing it to substitute the expert's credibility assessment for its own common sense determination. See United States v. Kime, 99 F.3d 870, 884-85 (8th Cir. 1996), cert. denied, 117 S.Ct. 1015, 1714 (1997). Dr. Pribor was permitted to comment on Nichols' reliability "in the guise of a medical opinion," United States v. Whitted, 11 F.3d 782, 785-86 (8th Cir. 1993), and this "impressively qualified expert's stamp" of untruthfulness on Nichols' story went beyond the scope of proper expert testimony. United States v. Azure, 801 F.2d 336, 340 (8th Cir. 1986).

American National claims that this testimony was not directly about Nichols as a witness but about her psychological state and general witness reliability. The problem Dr. Pribor's testimony was not so limited, however, and it crossed over the line of what is helpful to the trier of fact. See Fed. R. Evid. 702. Dr. Pribor did more than explain psychiatric terms and the situations in which they may arise. She provided her own opinion that Nichols' statements to Dr. Tyndall were influenced by recall bias,

_____

[6]In support of its position that all of Dr. Pribor's testimony was properly received, American National cites disability benefit cases in which physicians have testified about malingering. These cases involve judicial review of administrative decisions, however, and do not deal with the admissibility of expert opinion before a jury. See, e.g., Brasher v. Celebrezze, 340 F.2d 413, 418 (8th Cir. 1965). American National also cites two criminal cases where experts testified with respect to an insanity defense, but their testimony was not challenged or considered under Fed. R. Evid. 702 and 403. See United States v. Bramlet, 820 F.2d 851, 855-56 (7th Cir. 1987); Brown v. United States, 375 F.2d 310, 318 (D.C. Cir. 1966).

secondary gain, and malingering. Cf. United States v. Rouse, 111 F.3d 561, 570-71 (8th Cir.) (expert described "practices of 'suggestibility'" but did not testify that they were actually employed), cert. denied, 118 S.Ct. 261 (1997); Arcoren v. United States, 929 F.2d 1235, 1239 (8th Cir. 1991) (expert permitted to describe battered woman syndrome but not to give opinion on whether the victim's actions were affected by it). Weighing evidence and determining credibility are tasks exclusive to the jury, and an expert should not offer an opinion about the truthfulness of witness testimony. See Rouse, 111 F.3d at 571; Westcott v. Crinklaw, 68 F.3d 1073, 1076 (8th Cir. 1995). Dr. Pribor's testimony about psychiatric credibility, malingering, recall bias, and secondary gain went beyond the permissible areas of her testimony. She used these terms to indicate that Nichols' version of the facts was inconsistent and changed over time and that it was tainted by bias and desire for financial gain. These were inferences for the jury to draw from the admissible evidence before it, and Dr. Pribor's testimony impermissibly instructed the jury on how to weigh that evidence. See Whitted, 11 F.3d at 785; Azure, 801 F.2d at 340. As the dissent acknowledges, this case turned on whose story the jury would believe -- that of Nichols or that of her supervisors, Coates and Swift. Each side offered a different version of what had occurred so credibility was of critical importance. American National's closing argument went beyond what the dissent views as "fair argument" by using Dr. Pribor's testimony to suggest that recall bias and secondary gain had affected Nichols' descriptions of key events and by failing to adhere to the prior assurances that this part of the expert testimony was offered only on the issue of damages.

American National argues that Nichols opened the door to this evidence by offering Dr. Tyndall's testimony. Dr. Tyndall did not give any opinion about Nichols' credibility, however. She gave her diagnosis of Nichols and an opinion as to the type of event that could have caused or aggravated her condition, but she left it to the jury to decide whether such events actually took place as Nichols claimed. When American National asked her on cross examination about "psychiatric credibility," Dr. Tyndall stated she had heard the term but was not sure what counsel meant by it. When

pressed further, she said "there was a psychological credibility with her," but she never testified that Nichols had "good" psychological credibility or about her truthfulness or the reliability and consistency of her story. Dr. Pribor, on the other hand, used a psychological label to offer her evaluation of the truth of Nichols' statements, the accuracy of which is "a pure question of credibility." Westcott, 68 F.3d at 1077 (testimony directed to reliability of out of court statements addressed issue that was exclusively for the jury).

Because "[e]xpert evidence can be both powerful and quite misleading," a trial court must take special care to weigh the risk of unfair prejudice against the probative value of the evidence under Fed. R. Evid. 403. Daubert, 509 U.S. at 595 (internal quotations omitted). It is plain error to admit testimony that is a thinly veiled comment on a witness' credibility, see Whitted, 11 F.3d at 786-87, and in this case the prejudice was increased because of the use that was made of the testimony in closing argument.

B.

Nichols also argues that the district court abused its discretion in permitting testimony at trial about her having undergone an abortion when she was twenty six. In response to a discovery interrogatory asking about any surgical operations or other medical care after 1980, Nichols had disclosed that she had had an abortion in 1985. She later filed a motion in limine to exclude all evidence concerning the abortion due to its unfairly prejudicial effect. See Fed. R. Evid. 403. The court termed the evidence to be "volatile" but relevant to the claim for emotional distress damages, and it instructed counsel to approach the bench prior to any attempt to introduce it.

Without approaching the bench or giving prior notice, counsel for American National asked Dr. Tyndall on cross examination whether at the time of her evaluation she knew that Nichols was a practicing Catholic who had had an abortion. Dr. Tyndall answered that she had not then known about the abortion and conceded that an abortion

-14-

could have a psychological impact on someone. Dr. Pribor testified that her opinion on psychiatric credibility was supported by the fact that Nichols denied that the 1985 abortion had caused her continuing emotional distress. Nichols objected to questions about the abortion, raising the same grounds cited in the motion in limine and adding that Dr. Pribor had testified at her deposition that she had no opinion about whether the abortion had had an impact on her. Neither expert testified at trial that the abortion was a cause of Nichols' emotional distress or that it was a basis for her diagnosis of psychological or personality disorders.

Nichols argues on appeal that the district court failed to consider the inflammatory effect this evidence would have on the jury and its limited probative value. The court focused on the fact that she had disclosed it herself, but she had had a duty to answer the interrogatory even if the answer were not admissible at trial, see Fed. R. Civ. P. 26(b)(1). She also argues that American National introduced the evidence primarily to support Dr. Pribor's testimony about her psychiatric credibility, which was itself inadmissible. American National responds that the abortion was relevant to damage issues and probative as an alternative cause of her emotional distress and that it was therefore not unfairly prejudicial.

The district court has discretion to exclude relevant evidence if its probative value is substantially outweighed by the danger of unfair prejudice, see Fed. R. Evid. 403. Unfair prejudice relates to the risk that the jury will decide the case on an improper basis. See United States v. Guerrero-Cortez, 110 F.3d 647, 652 (8th Cir.), cert. denied, 118 S.Ct. 604 (1997). Informing the jury that Nichols had had an abortion presented the danger of provoking "the fierce emotional reaction that is engendered in many people when the subject of abortion surfaces in any manner." Nickerson v. G.D. Searle & Co., 900 F.2d 412, 418 (1st Cir. 1990). The evidence exposed a very private area of Nichols' life and a type of experience which frequently involves a conflict in conscience. Such evidence tends to be highly prejudicial. That Nichols had had the

-15-

abortion even though it was against her religion increased the likelihood that the jury would view her as immoral and not worthy of trust and reach its verdict on such basis.[7]

The evidence also had very little probative value. American National claimed it would be relevant on damages, but neither expert gave an opinion that the abortion had contributed to Nichols' emotional distress, only that it could have. Dr. Pribor apparently stated in her deposition that she had no opinion about its impact on Nichols' wellbeing. Although Dr. Tyndall and Dr. Pribor differed to some extent in determining the psychological disorders Nichols suffered, neither one indicated in her trial testimony that the abortion played a role in her diagnosis. It was thus incorrect to base admission of the evidence on the ground that it had been relied on in forming diagnoses. Furthermore, the abortion was remote in time. Nichols was limited to evidence from the years 1991 to 1993, and the abortion occurred in 1985 and was not shown to be related to her employment history at American National. Cf. Berry v. Deloney, 28 F.3d 604, 608 (7th Cir. 1994). Finally, there were no limiting instructions to the jury to consider the abortion evidence only as to damages and not in evaluating Nichols' character and credibility. Cf. id. Under these circumstances it was an abuse of discretion to admit the evidence concerning Nichols' abortion. See Guerrero-Cortez, 110 F.3d at 652.

C.

Nichols also argues that the exclusion of other evidence prevented the jury from hearing the full story about her work environment at American National and the circumstances surrounding her resignation. The district court ruled before trial on a summary judgment motion that certain allegations by Nichols were outside the permissible scope of the lawsuit because they had not been investigated by the EEOC

---

[7]Apparently no objection was raised that the evidence was inadmissible under Fed. R. Evid. 610 which prevents the use of religious beliefs to impair credibility.

and were not the subject of a conciliation proceeding.  See E.E.O.C. v. Delight Wholesale Co., 973 F.2d 664, 668-69 (8th Cir. 1992).  At the same time, the court granted a motion in limine to exclude the evidence.  The rulings excluded evidence that Bob Coates, her district manager, had sexually assaulted Nichols on January 22, 1993, grabbed her breasts on January 25, 1993, and made threats to prevent her from mentioning the incidents to the EEOC.[8]  This excluded some of the worst evidence concerning Nichols' work environment and enabled American National to argue at trial that she suffered no damages within its computation of the 300 day limitations period. Nichols argues that this prevented a fair presentation of her case.

Nichols testified in a pretrial deposition about the two January incidents involving sexual advances by Coates.  On January 22 she and Bob Baker, her boyfriend and also an employee of American National, met Coates and other company agents at their usual Friday evening meeting place for "shop talk."  Joint Appendix at 567.  After the group left the bar, Nichols and Baker permitted Coates to stay at their residence to avoid driving while intoxicated.  Baker and Coates discussed the quality of another agent's work and then Baker went to bed.  Nichols claims that Coates proceeded to make lewd comments, pinned her down, and demanded sex.  She escaped and contacted a police officer friend who was later included on her witness list but prevented from testifying by the exclusion order.  When Coates came by her home on January 25, he caressed her knees, came up behind her and held her breasts, and demanded she sign an undated resignation form in exchange for her pay check.

Neither January incident was mentioned when Nichols went to the EEOC, but sexual harassment by Bob Coates was.  The harassment report about Coates is included in the investigator's notes with the comment that Nichols did not want to follow up on

_____

[8]The district court's written exclusion order only mentioned the January 22 incident in its discussion of the scope of the EEOC charge, but at trial the court ruled that the January 25 incident would be excluded for the same reason.

it. In a pretrial affidavit, Nichols told the court that Coates had intimidated her into not discussing the assaults with the EEOC investigator by repeated threats and questions about what would happen if she died in the middle of the investigation. There was evidence at trial that the EEOC investigator interviewed Coates concerning the circumstances that could have caused Nichols to resign, including physical gropings by Del Swift, but she testified that she did not investigate any allegations that Coates had sexually harassed Nichols.

Nichols argues that it was not necessary for the EEOC to have had an opportunity to investigate each and every factual allegation supporting her sexual harassment and constructive discharge claims and that her failure to mention these particular incidents to the EEOC should be excused because she did refer to harassment by Coates and because of the threats she received. Nichols says she was prejudiced because the jury did not get a complete picture of what evidence there was in support of her claims. For example, Dr. Pribor testified that in her opinion Nichols was not suffering from PTSD because there was no evidence of a traumatic event that could have caused the disorder, and Dr. Tyndall testified in her deposition that the January 22 assault by Coates was one of the traumatic causal events. Nichols argues that she should have been allowed to rebut Dr. Pribor's testimony with the evidence about Coates' sexual assaults and threats. American National responds that this evidence should not be considered within the scope of the EEOC charge because it is not of the same nature as the allegations in the charge and there was no evidence that the EEOC addressed them in its investigation or conciliation efforts or that the company had notice of them prior to the litigation.

The district court's ruling on the legal issue of the proper reach of a Title VII claim is reviewed de novo, see Boge v. Ringland-Johnson-Crowley Co., 976 F.2d 448, 450 (8th Cir. 1992), and the motion in limine excluding the evidence is reviewed for abuse of discretion. Here the trial court determined on a summary judgment motion that the allegations related to the January assaults were beyond the reach of Nichols'

claim because they had not been specified in her charge to the EEOC. A Title VII plaintiff must file a charge of discrimination with the EEOC before bringing a civil suit, but the scope of the subsequent action is not necessarily limited to the specific allegations in the charge. See Delight Wholesale Co., 973 F.2d at 668. In determining whether an alleged discriminatory act falls within the scope of a Title VII claim, the administrative complaint must be construed liberally "in order not to frustrate the remedial purposes of Title VII," Cobb v. Stringer, 850 F.2d 356, 359 (8th Cir. 1988), and the plaintiff may seek relief for any discrimination that grows out of or is like or reasonably related to the substance of the allegations in the administrative charge. Philipp v. ANR Freight Sys., Inc., 61 F.3d 669, 676 (8th Cir. 1995); Delight Wholesale Co., 973 F.2d at 668.

Nichols claimed that she was subjected to a hostile work environment at American National that was so intolerable she was forced to resign. Her claim before the EEOC involved alleged incidents of sexual harassment, including unwelcome groping by supervisor Del Swift, and her Title VII complaint and evidence at trial alleged derogatory and suggestive remarks and unwelcome touching and sexual advances by Swift, Coates, and others. It is necessary to "'look[] at all the circumstances'" in order to determine whether the environment was hostile or abusive. Faragher v. City of Boca Raton, 118 S.Ct. 2275, 2283 (1998)(citation omitted); see also Hathaway v. Runyon, 132 F.3d 1222 (8th Cir. 1997). All evidence concerning abusiveness of a plaintiff's working conditions is relevant to this inquiry, see Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993), and allegations that during her period of employment Nichols' supervisor Coates attempted to rape her and grabbed her breasts fit within that category. The whole context of the interrelationship between the key players in the work relationship needs to be considered in such a case. See Meritor Sav. Bank v. Vinson, 477 U.S. 57, 69 (1986); see also Hicks v. Gates Rubber Co., 833 F.2d 1406, 1415-16 (10th Cir. 1987). An employer is vicariously liable for "an actionable hostile environment created by a supervisor," but if no "tangible employment action, such as discharge, demotion, or undesirable reassignment" is taken, an employer

can avoid liability by proving an affirmative defense of reasonable oversight and of the employee's unreasonable failure to take advantage of corrective opportunities. See Faragher v. City of Boca Raton, 118 S.Ct. 2275, 2292-93 (1998); Burlington Indus., Inc. v. Ellerth, 118 S.Ct 2257, 2270 (1998).

The district court refused to grant summary judgment to American National on Nichols' sexual harassment and constructive discharge claims and treated her hostile work environment claim as alleging a pattern of incidents making for a continuing violation. See Varner v. National Super Mkts., Inc., 94 F.3d 1209, 1214 (8th Cir. 1996); Satz v. ITT Financial Corp., 619 F.2d 738, 744 (8th Cir. 1980). Where, as here, a court has determined that a plaintiff's case described a continuing violation, allegations that fall within the scope of the discriminatory pattern are treated as "like or related" to that claim. See Philipp, 61 F.3d at 676. Nichols' claim included evidence of unwelcome sexual advances by both Coates and Swift, and the January 1993 incidents were consistent with that evidence. These allegations were thus not a separate theory of discrimination, and they did not involve a distinct discriminatory action that was different in nature or distanced in time from the other claims. Cf. Tart v. Hall Behan Lumber Co., 31 F.3d 668, 672-73 (8th Cir. 1994); Williams v. Little Rock Mun. Water Works, 21 F.3d 218, 223 (8th Cir. 1994); Boge, 976 F.2d at 451. Since they were not outside the framework or scope of the administrative charges, they should not have been excluded for that reason by summary judgment or motion in limine.

American National also argues that the January 1993 assaults by Coates were properly excluded because they took place after Nichols was no longer an employee of the company,[9] but the argument about when she left the company raises issues of fact

_____

[9]American National does not argue that the January 22 assault was properly excluded because it happened outside the workplace. Nichols worked out of her home, she was frequently obligated to work with Coates outside the office, and he often came to her home in connection with business.

for a jury to resolve. The dissent accepts American National's argument that these incidents occurred after the last day Nichols actually worked, but there is conflicting evidence in the record about the date her employment ended. Coates told the EEOC investigator that Nichols had resigned on January 25 which is consistent with her story that on that day he asked her to sign an undated resignation in return for her check and evidence that the date entered on the resignation form, January 22, was in his handwriting. The circumstances and timing of Nichols' resignation and whether or not she collected premiums during the weeks of January 11th and January 18th, were hotly disputed at trial. The district court was unable to determine on summary judgment the date she communicated her intent to resign or the date she actually stopped working. Nichols presented evidence that Coates admitted to the EEOC that she worked for American National until January 25, 1993 when she resigned at his urging, but there was also evidence that she had accepted different employment by January 18 and had communicated her intent to resign before that date. The verdict forms used at trial submitted this factual issue to the jury, but the question remained unanswered for the reasons previously discussed. Nichols would be able to recover on her hostile environment claim if the jury found that abusive incidents occurred both within the filing period and while she was still working for American National. See Kimzey v. Wal-Mart Stores, Inc., 107 F.3d 568, 572-73 (8th Cir. 1997). There were material issues of fact related to whether the January incidents -- alleging very abusive conduct -- occurred while Nichols was still an employee, and it would be up to the trier of fact to decide the date on which Nichols' employment ended.

D.

Nichols was prevented from introducing customer premium receipt books to support her testimony about when she stopped working for American National. She says she was forced to resign on Monday, January 25, 1993 after two weeks of nominal

vacation during which she made customer calls and collected premiums. Premiums were to be turned in to the company by the end of the week in which they were collected, and Nichols testified that she turned in premiums on each of her last two Fridays, January 15 and 22. American National contests her version of the facts and says she communicated her intent to resign by January 15 at the latest and that her final week of working and collecting premiums was the week starting January 4. It claims she was on the payroll until January 22 only because she was receiving vacation pay during her last two weeks of employment and that any premium money she turned in later in the month was actually collected before January 8. It objected to introduction of the premium receipt books on the basis that they were not timely produced, and Nichols argues that the district court abused its discretion in excluding them.

The issue of when Nichols last collected premiums was important, and Nichols planned to offer proof on this issue through company form 1487. American National agents were required to turn in this type of form along with collected premiums, and the forms recorded payments as they were received. Nichols made several discovery requests for 1487 forms which would show she had collected premiums during her last two weeks with the company. Not until a few days before trial, at a hearing on her motion to compel production, did American National indicate that the forms from those weeks had long before been destroyed under a two year retention policy. The company had previously produced what it had described as the final six 1487 forms submitted by Nichols, the last of which was dated January 5, 1993. It now explained that these six forms had not been destroyed with the rest because they had been held separately for an audit of Nichols' termination.

When Nichols learned just before trial that the 1487 forms she had requested were unavailable, she then tried to obtain premium receipt books from her former customers as an alternate method of proof. These books were kept by customers as a record of their premium payments. In them the agent would note the date and each amount paid and initial the entry. Nichols was able to obtain such premium receipt

books from eight customers, and she transmitted copies of the relevant pages by facsimile to American National on the Saturday before trial. On Monday, the day trial was to begin, Nichols sought leave to supplement her exhibit list with these records and stated she intended to use them to refresh her recollection, under Fed. R. Evid. 803(5), as to which premiums she had collected during her last two weeks of work. American National filed a supplemental motion in limine to exclude the premium receipt books, claiming unfair prejudice because of lack of time to authenticate the records. Nichols argued that the delay was due solely to the company's failure to notify her sooner of the two year retention policy and that she had obtained the customer names from a January 25, 1993 account audit report generated by American National which was on her exhibit list. The court granted the supplemental motion in limine, ruling that the policy holders could have been contacted earlier and that the production was untimely and therefore prejudicial to American National.

Nichols argues on appeal that she demonstrated good cause for not producing the premium receipt books earlier because she had no way of knowing that the 1487 forms she needed had been destroyed until American National disclosed it shortly before trial. She contends that the books were admissible, under Fed. R. Evid. 1004(1) and (3), as other evidence of the contents of the 1487 forms and that they were essential to a fair determination by the jury of the events surrounding her resignation. American National responds that the district court has broad discretion to exclude evidence not disclosed in compliance with its pretrial orders, see Admiral Theatre Corp. v. Douglas Theatre Corp., 585 F.2d 877, 897 (8th Cir. 1978); Burlington Northern R.R. Co. v. Nebraska, 802 F.2d 994, 1005 n.10 (8th Cir. 1986), and that the records were properly excluded because it was unprepared to cross examine or present its own evidence relating to the exhibits and because Nichols could have obtained them earlier.

The late attempt to use the premium receipt books was not due to bad faith or lack of diligence.[10] Nichols did not fail to file a supplementary exhibit request when she became aware of the need to do so, cf. Iowa-Mo Enterprises, Inc. v. Avren, 639 F.2d 443, 447 (8th Cir. 1981), or repeatedly violate pretrial orders and deadlines during discovery, cf. Admiral Theatre Corp., 585 F.2d at 897. She only became aware of the need for this particular evidence when American National notified her on the eve of trial that the other forms had been destroyed. The premium receipt books would have assisted the jury in determining whether Nichols worked when she claimed she had, which in turn would have affected its consideration of other evidence. The district court's ruling took account of American National's expressed concern about abbreviated time to investigate and respond to this evidence, but in the event of a new trial there would be opportunity to look into the evidence so that concern would be removed. See Burlington Northern R.R. Co., 802 F.2d at 1005 n.10.

E.

Nichols argues that the judgment must be reversed and that she is entitled to a new trial. American National says even if the district court erred or abused its discretion, it was harmless error because Nichols was not prejudiced by it and the judgment should be upheld.

A judgment should only be reversed because of erroneous evidentiary rulings if they are of a nature to have a substantial influence on the jury verdict. See Rouse, 111 F.3d at 572; Peterson v. City of Plymouth, 60 F.3d 469, 475 (8th Cir. 1995). In this

---

[10]Nichols did not realize until that time that the receipt books would be her only method of proving how long she continued to perform work. She had requested the 1487 forms during discovery but was forced to bring a motion to compel in order to obtain a response. It was at the hearing on that motion just before trial that she learned that the requested documents for the critical weeks between January 5 and January 25 had been destroyed.

-24-

case the cumulative effect of the evidence that was inadmissible under Fed. R. Evid. 702 and 403 and the exclusion of evidence designed to put the full context of her employment history before the jury prejudiced Nichols' ability to have her case fairly considered on its merits. See Crane v. Crest Tankers, Inc., 47 F.3d 292, 296 (8th Cir. 1995); see also Fed. R. Civ. P. 61 (error is only reversible when it appears "inconsistent with substantial justice" and affects "substantial rights of the parties"). Although American National argued to the district court that both the expert opinion on psychiatric credibility and the evidence of an abortion inconsistent with religious beliefs were offered only for a limited purpose, this evidence was used to cast doubt on her motivation and her ability to tell the truth. The case turned on "whose story the jury believed," Cummings v. Malone, 995 F.2d 817, 825 (8th Cir. 1993), and American National relied heavily on the inadmissible evidence to argue in closing that Nichols had distorted what happened to her at the company and to undermine her credibility. Cf. Whitted, 11 F.3d at 787. Although American National now contends that this evidence could not have been prejudicial because it only went to damages, a question which the jury never reached, its own closing argument at trial demonstrates that the evidence was intended to influence the jury's determination of liability. It is not possible to "say with certainty that the jury's decision would have been the same absent this evidence." Hale v. Firestone Tire & Rubber Co., 756 F.2d 1322, 1333 (8th Cir. 1985); see Campbell v. Coleman Co., 786 F.2d 892, 896 (8th Cir. 1986).

"[G]iven the way this trial unfolded," erroneous evidentiary rulings "so seriously altered its course" that Nichols was denied a fair and impartial presentation of her case, and the error was therefore not harmless. Cummings, 995 F.2d at 827; Murphy v. L & J Press Corp., 558 F.2d 407, 412 (8th Cir. 1977). The able district court was presented with a number of the evidentiary arguments in advance of trial and did not then have the benefit of knowing how the evidence would be presented and used. If the whole series of evidentiary motions had been considered at the time of trial and in relation to each other, the total picture would have been clearer. The evidence admitted over objection turned out not to be so limited in nature as counsel had argued, and it

-25-

was not used in the restricted way counsel had advocated. The record brings to mind the old adage that once the camel's nose is under the tent, it is not easily dislodged and resulting damage not easily curtailed.

Thorough review of the record makes the unfair prejudice at trial apparent, particularly in the absence of limiting instructions to the jury and the restrictions placed on the presentation of Nichols' evidence. The case came down to a swearing match, and it was up to the jury to decide which side to believe. Dr. Pribor's opinion about Nichols' credibility and motivation and the evidence about her violating her religious beliefs by having an abortion denied Nichols the "right to untainted jury deliberations and . . . a verdict which is based on admissible evidence." Crane, 47 F.3d at 297. Under these circumstances, she is entitled to a new trial on her claims of sexual harassment and constructive discharge. See id. It is for the jury to decide who should prevail in this case, but it should be on the basis of full and fair consideration of the evidence. Murphy, 558 F.2d at 412.

## III.

This is the unusual case where a new trial is needed because a full and fair presentation of the claims was impeded at trial, and substantial prejudice resulted. It very well may be that American National will be entitled to judgment in its favor after a retrial, but it is not now possible to have confidence in the outcome of the first. See Hale, 756 F.2d at 1333; Murphy, 558 F.2d at 412. For the reasons discussed, we reverse and remand to the district court with directions to vacate the judgment and to grant Nichols a new trial on her claims for sexual harassment and constructive discharge.

LOKEN, Circuit Judge, dissenting.

I respectfully dissent. After a seven-day trial, the jury returned a verdict in favor of American National Insurance Company on Margaret Nichols's claims of sexual harassment and constructive discharge. In my view, the case was fairly tried, and we should affirm the judgment entered on the jury's verdict.

1. The Expert Testimony Issue. The primary support for Nichols's claim for $500,000 in compensatory damages for emotional distress was the testimony of her expert psychologist. Dr. Tyndall testified that Nichols's mild depression, generalized anxiety, and post traumatic stress disorder were caused by, or at least aggravated by, her employment experience at American National. On cross exam, the defense established that Dr. Tyndall's opinions were based entirely upon what Nichols had told Dr. Tyndall, who made no detailed review of Nichols's family history, medical records, prior and subsequent employment, and other possible causes of emotional distress.

After unsuccessfully objecting to Dr. Tyndall's opinions as lacking foundation, the defense attempted to rebut her testimony with two experts. Psychologist Wetzel, who did not personally examine Nichols, testified that Dr. Tyndall's methodology was not appropriate forensic psychology. That set the stage for psychiatrist Pribor, who had personally interviewed Nichols for some five hours. When Dr. Pribor first introduced the concept of psychiatric credibility, plaintiff objected that this expert was about to tell the jury that Nichols should not be believed. The defense explained that Dr. Pribor's testimony would not be an attack on Nichols's credibility but instead an attack on the credibility of Dr. Tyndall's opinions, based upon the fact that Dr. Tyndall had taken whatever Nichols told her at face value. The district court ruled, "[Plaintiff] will have to listen and see what [Dr. Pribor] says and make objections. I can't give you a motion in limine on this since I don't know exactly what [defense counsel] is getting into."

I conclude this evidentiary dispute did not result in reversible error for three reasons. First, there was nothing wrong with the defense concept for impeaching Dr. Tyndall's opinions. One mental health expert may opine that the opponent's expert should not have accepted the plaintiff's statements as to damage and causation without further investigation. The district court might have cautioned the defense not to use the term psychiatric credibility because it sounds like the expert is invading the jury's province. But the failure to do that was not a plain error abuse of discretion. Nichols opened up this line of testimony by the use of her expert. Cf. United States v. Gipson, 862 F.2d 714, 717 (8th Cir. 1988). Thus, the district court properly denied Nichols's initial motion in limine.

Second, Nichols did not preserve the issues on which the court bases its reversal. The word Daubert does not appear in the trial transcript, and for good reason -- Nichols was relying on the same kinds of psychological concepts and opinions for her large emotional distress damage claim. Moreover, when Dr. Pribor introduced rather late in her direct testimony the concepts of "recall bias," "secondary gain," and "malingering," Nichols did not object, despite the court's explicit instruction that specific objections were necessary. Finally, Dr. Pribor's use of these terms was limited to supporting her opinion that Nichols's statements to Dr. Tyndall should not have been taken at face value. This defense expert did not comment directly on Nichols's fact testimony. To the extent Dr. Pribor's testimony indirectly cast doubt on Nichols's overall credibility, it was a self-inflicted wound caused by her own reliance on a psychological expert.

Third, given the specific context of Dr. Pribor's testimony, any error was harmless. The key evidence at trial was the lengthy direct and cross examination of Nichols, plus the credibility of terse testimonial denials by Swift and Coates. During the lengthy closing arguments, Dr. Pribor's testimony was mentioned only once, when defense counsel argued that Nichols changed her story for the litigation and had a financial motive to do so:

Now that's a mighty motive to distort. To begin, remember that phrase, recall bias. I think well maybe she does actually believe these things happened, but recall bias may very well be involved. Remember that term that the psychiatrist talked about? Secondary gain. How that can affect how one recalls things that happened.

That is fair argument. Thus, this record will not support an inference that the jury's assessment of Nichols's credibility was spoon fed by Dr. Pribor.

2. The Abortion Testimony. Nichols disclosed her prior abortion in interrogatory answers. The district court denied her pretrial motion in limine to exclude all references to the abortion because the interrogatory answers had been made available to the parties' experts. The issue came up briefly twice at trial. Defense counsel's question to Dr. Tyndall and Dr. Pribor's mention of the abortion as one pre-American National stressor were consistent with the pretrial discussion and ruling, so there was no unfair surprise. Viewed in context, the testimony was relevant, and any Rule 403 error was harmless.

3. The Coates Assaults. Nichols's EEOC charge only complained of constructive discharge -- that she was forced to resign. I agree with the court that evidence of sexual harassment creating a hostile work environment would be relevant to that charge, and alleged sexual assaults could constitute such evidence. However, the alleged January 1993 sexual assaults by Coates occurred after the last day Nichols actually worked, so they could not be evidence supporting a claim of constructive discharge. Thus, the alleged assaults could only be relevant to a different kind of sexual harassment claim. Yet Nichols did not generally allege sexual harassment in her EEOC charge, and the EEOC investigator testified at trial that she did not investigate harassment by Coates *because Nichols told her not to*. This unique and highly inflammatory accusation was never the subject of EEOC conciliation *and* it did not support the constructive discharge claim that was conciliated. On this record, I

conclude the district court correctly excluded this evidence.  Indeed, the court arguably gave Nichols more leeway than her EEOC charge warranted when it submitted to the jury a separate claim of sexual harassment, a claim that was not in her EEOC charge. The evidence on both claims was properly limited to Nichols's work experience at American National, and the jury rejected both claims, sexual harassment and constructive discharge.  The verdict should be upheld.

4.  The Receipt Books.  This evidence was relevant only to the statute of limitations issue, which the jury never reached.  Therefore, by itself this evidentiary ruling cannot be reversible error.  Moreover, the district court's decision to exclude this evidence because of Nichols's tardy disclosure was correct -- Nichols had ample warning of American National's document retention policy and should have gathered up relevant customer 1487's long before trial and disclosed them on her exhibit lists. There might well be foundation and authenticity problems with such documents, so defense counsel's concern about their last minute disclosure was understandable.

A true copy.

ATTEST:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.

-30-